WIGGINS v CITY OF BURTON

Docket No. 293023. Submitted November 4, 2010, at Detroit. Decided February 8, 2011, at 9:05 a.m.

Charles D. and Susan Wiggins brought an action in the Genesee Circuit Court against the City of Burton, William L. and Paula M. Mahler, Thomas A. and Margaret A. Heckman, and others. The Wigginses, the Mahlers, and the Heckmans owned neighboring properties in the City of Burton. The property owned by the Wigginses (the Wiggins property) was in a subdivision that was platted in the 1990s. The subdivision plat indicated that a portion of the Wiggins property was encumbered by a private easement for storm detention. After the subdivision was constructed, the Mahlers and the Heckmans, who lived outside the new subdivision, began to have surface-water drainage problems. In response, the city had a drainage system installed on the Mahler and Heckman properties that led to the storm-detention easement on the Wiggins property. The Wigginses alleged that the construction of the drain on their property and the resultant flow of water onto their property from the drainage system constituted a trespass and a nuisance and that the city had taken their property without just compensation. The Wigginses sought money damages, declaratory relief, and to quiet title to their property. The court, Geoffrey L. Neithercut, J., granted summary disposition in favor of the Mahlers and the Heckmans and dismissed the Wigginses' claims against the city without prejudice. The Wigginses appealed, and the city cross-appealed.

The Court of Appeals *held*:

1. The plain language of the plat indicated that the scope of the easement on the Wiggins property was limited to storm detention, meaning the detention of waters that naturally flowed to the land as a result of storms. The installation of the drain on the Wiggins property fell outside the scope of the easement. Because the drain was a tangible object, its presence was actionable in trespass rather than nuisance. Although the Mahlers and the Heckmans did not personally enter the Wiggins property, their requests for drainage relief from the city and their subsequent authorization for the city or its agents to construct the drainage system were sufficient acts to give rise to liability. Accordingly, the installation

and continuing presence of the drain on the Wiggins property constituted a trespass by the Mahlers and the Heckmans. The Wigginses were entitled to nominal damages, any actual damages, and injunctive relief enjoining the Heckmans' and the Mahlers' use of the drainage system and requiring them to remove that portion of the drainage system that encroached on the Wiggins property.

2. Although the Wigginses' request for declaratory relief was incorrectly pleaded as a separate cause of action rather than as a prayer for relief, the circuit court erred by failing to consider the request as it related to the Heckmans and the Mahlers. The Wigginses were minimally entitled to a declaration that the installation and construction of the drain on their property exceeded the scope of the storm-detention easement encumbering that property and that the Heckmans and the Mahlers committed a trespass by authorizing or ratifying the city's construction of the drain.

3. The circuit court properly declined to consider the Wigginses' quiet-title claim as it related to the Heckmans and the Mahlers because the Wigginses' complaint asserted their quiet-title claim against the city only, not against the Heckmans or the Mahlers.

4. The natural flow of surface water from an upper, dominant estate forms a natural servitude that encumbers a lower, servient estate. However, the owner of the upper estate may not increase the amount or concentrate the flow of water onto the servient estate. In this case, there remained a genuine issue of material fact concerning whether the flow of water onto the Wiggins property, as distinct from the construction of the drain itself, constituted an actionable trespass by increasing the amount of surface water that naturally flowed to the Wiggins property. If the flow of surface water onto the Wiggins property was materially increased, then the Heckmans and the Mahlers would also be liable for this additional trespass because they authorized the construction of the drain, entitling the Wigginses to at least nominal damages, and injunctive and declaratory relief.

5. The circuit court erred by dismissing the Wigginses' claims against the city on the basis of MCL 280.75, which did not apply under the particular circumstances of this case. The procedures set forth in MCL 280.75 apply only to proposed drains and not to drains that are already in existence.

6. There remained a genuine issue of material fact concerning whether the city's installation of the drain on the Wiggins property constituted a taking of the Wigginses' property without just

compensation. The construction and installation of the drain was an affirmative act directed at the Wigginses' property by the city that had the effect of limiting the use of the Wigginses' property, but it was not clear how much damage was caused by the installation of the drain and whether the city's actions were a substantial cause of a decline in the value of the property. If the installation of the drain on the Wiggins property was a substantial cause of a decline in the value of the Wiggins property, the Wigginses would be entitled to compensation.

7. Because of its erroneous reliance on MCL 280.75, the circuit court did not address the question of the city's entitlement to governmental immunity with regard to the Wigginses' tort claims. On remand, the circuit court must determine whether the city is entitled to governmental immunity with respect to the Wigginses' tort claims.

Affirmed in part, reversed in part, and remanded for further proceedings.

1. PROPERTY — EASEMENTS — SCOPE — DETERMINATION — PLAIN MEANING — STORM-DETENTION EASEMENTS — DRAINS.

To determine the scope of an express easement, courts should first look to the language of the easement itself; when that language is clear it must be enforced as written; an express easement for storm detention is limited to the detention of waters that naturally flow to the easement as a result of storms; the installation of a drainage system to carry surface water to a storm-detention easement falls outside the scope of the express easement when the easement does not include language relating to the installation of pipes or drains.

2. TRESPASS — JOINT TORTFEASORS — AUTHORIZATION OF THE TRESPASS.

All persons who instigate, command, encourage, advise, ratify, or condone the commission of a trespass are cotrespassers and are jointly and severally liable as joint tortfeasors; a property owner who requests drainage relief from a city and authorizes the construction of a drainage system by the city, the installation of which constitutes a trespass on another's land, may be held liable for the trespass even though he or she did not personally set foot on the property.

3. PROPERTY — DRAINAGE — SURFACE WATERS — NATURAL SERVITUDES — INCREASING THE FLOW OR CONCENTRATION OF SURFACE WATERS ONTO A SERVIENT ESTATE — TRESPASS.

The natural flow of surface water from an upper, dominant estate forms a natural servitude that encumbers a lower, servient estate,

but the owner of the upper estate may not increase the amount or concentrate the flow of water onto the servient estate; a person who increases the flow of water from an upper estate onto a lower estate may be held liable for trespass.

4. DRAINS — DRAIN CODE — APPLICABILITY — ESTABLISHED DRAINS.

Chapter 4 of the Drain Code concerns the procedures applicable to proposed drains rather than established drains (MCL 280.71 *et seq.*).

*Fausone Bohn, LLP* (by *Christopher S. Frescoln*), for Charles D. and Susan Wiggins.

*Plunkett Cooney* (by *Mary Massaron Ross, Audrey J. Forbush,* and *Hilary A. Ballentine*) for the city of Burton.

*Raftery, Janeczek & Hoelscher, P.C.* (by *Jeanne V. Barron* and *James J. Raftery*), for William L. and Paula M. Mahler.

*Michael J. Mangapora, P.C.* (by *Rex A. Ziebarth*), for Thomas A. and Margaret A. Heckman.

Before: BECKERING, P.J., and JANSEN and TALBOT, JJ.

PER CURIAM. Plaintiffs Charles D. Wiggins and Susan Wiggins (the Wiggins) appeal by right the circuit court's order denying their motion for summary disposition, granting summary disposition in favor of defendants William L. Mahler and Paula M. Mahler (the Mahlers), granting summary disposition in favor of defendants Thomas A. Heckman and Margaret A. Heckman (the Heckmans), and dismissing all claims against the city of Burton (the City) "without prejudice so that the [Wiggins] and the City . . . can follow the procedure . . . laid out in MCL 280.75." The City cross-appeals the same circuit court order. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I. FACTS AND PROCEDURAL HISTORY

The dispute in this case involves the issue of surface-water drainage on three neighboring parcels of real property located in the City. The Heckmans have lived at 5217 Maple Avenue and the Mahlers have lived at 5245 Maple Avenue for some time. A subdivision known as Maplewood Meadows No. 1 was laid out and platted, apparently in the mid-1990s. Maplewood Meadows No. 1 lies to the east of the Heckman parcel and the Mahler parcel and abuts both parcels along portions of their eastern property lines.

The Wiggins purchased Lot 51 in Maplewood Meadows No. 1, commonly known as 5257 Walnut Drive, on December 19, 2003. A warranty deed executed on December 19, 2003, conveyed Lot 51 to the Wiggins "[s]ubject to all existing building and use restrictions, easements and zoning ordinances, if any." As shown on the final plat of Maplewood Meadows No. 1, a large section of the Wiggins parcel (more specifically, the west and north sides of Lot 51) is encumbered by a "PRIVATE EASEMENT FOR STORM DETENTION."[1] This "storm detention" easement encumbers portions of four other adjoining lots in the subdivision as well. According to the parties, there is no granting instrument creating or relating to the storm-detention easement other than the final plat itself. The Wiggins admit that they were aware of the storm-detention easement encumbering the west and north sides of lot 51 when they purchased the parcel in 2003.

The Heckmans and Mahlers assert that the construction of Maplewood Meadows No. 1 caused significant

---

[1] While it seems that the word "retention" would have been more appropriate than the word "detention" in this context, the word "detention" is used on the subdivision's final plat and has been used by the parties throughout the pendency of this case.

surface-water drainage problems on their respective parcels. Specifically, the City and the Mahlers contend that before the construction of Maplewood Meadows No. 1, the surface waters historically and naturally ran away from the Heckman and Mahler parcels, and toward the area now encumbered by the storm-detention easement. The City has offered a hydrogeologic contour map to support this contention. The City and the Mahlers contend that the construction of Maplewood Meadows No. 1 reversed this historic flow of surface water, causing the surface waters to begin flowing *toward* the Heckman and Mahler parcels.

Thomas Heckman apparently lodged several complaints with the City concerning this surface-water drainage problem, dating as far back as June 1995. The minutes of the Burton City Council indicate that Mr. Heckman appeared before the council on several occasions to complain about the "flooding problems on his property." On May 21, 2007, the Burton City Council voted 5 to 1 to approve the expenditure of $1,750.00 to pay for a "relief drain project at 5245 Maple and 5217 Maple Ave[nue]." The City's plan was to install individual drains on the Heckman and Mahler parcels, and to connect these individual drains to the area of the existing storm-detention easement on the Wiggins parcel by way of a 180-foot drainage pipe.

In May 2007, the Heckmans and Mahlers signed documents with the City acknowledging that the City would construct and install drains on their respective properties and that the drainage project, when completed, would "belong solely to the [Heckmans and Mahlers] and will be the [Heckmans' and Mahlers'] responsibility to maintain/repair." Subsequently, the City contracted with Doan Enterprises, Inc. to complete the proposed drainage project. In late 2007, Doan

Enterprises excavated a ditch, installed drains on the Heckman and Mahler parcels, and laid pipe connecting these drains to the area of the storm-detention easement on the Wiggins property. The practical effect of this drainage project was to carry the accumulated surface waters away from the Heckman and Mahler parcels and to deposit those waters in the Wiggins' backyard.

In March 2008, the Wiggins filed a five-count complaint in the Genesee Circuit Court, setting forth claims entitled "QUIET TITLE" (count 1), "DECLARATORY RELIEF" (count 2), "TRESPASS" (count 3), and "NUISANCE" (count 4) against the City, the Mahlers, the Heckmans, Doan Enterprises, and certain agents of the City.[2] The Wiggins also set forth a claim of inverse condemnation (count 5) against the City only. The Wiggins sought both money damages and injunctive, declaratory, and equitable relief. Paragraph 35 of the complaint, which captured the essence of the Wiggins' grievances, alleged that the City had

> excavated a drainage trench that originated from the Mahler Property and ran in a northerly direction from the Mahler Property in a relatively straight line through the Heckman Property on the eastern edge of the Heckman Property . . . and continued the excavation in a northerly direction in a straight line on the Heckman Property along the eastern edge of the Heckman Property proximate to the area where the Heckman Property borders the Wiggins Property for a distance of approximately thirty (30) feet, at which point [the City] then redirected the trench at an approximate 45-degree angle and entered into and upon the Wiggins Property and continued its excavation of the trench, removing sod, turf and soil from the Wiggins Property, and terminated the trench approximately in the

---

[2] Doan Enterprises and the named agents of the City have been dismissed from the case and are not involved in the instant appeal.

middle of the Wiggins' backyard immediately adjacent to their childrens' [sic] swing set.

The Wiggins alleged that neither the City, nor the Heckmans, nor the Mahlers, nor Doan Enterprises, nor any of the City's agents had ever sought permission to enter onto their property, to excavate the ditch, or to lay the drainage pipe. The Wiggins also alleged that

> [t]he [e]ffect of the project . . . was . . . an alteration and diversion of the natural flow of the surface water from the Heckman Property and the Mahler Property, causing an intentionally focused, increased and concentrated flow of the surface water from those properties directly onto the Wiggins Property, causing significant damages thereby.

The Wiggins asserted that none of the defendants had been authorized to enter onto their property, to excavate the ditch, or to lay the drainage pipe in question. The Wiggins alleged that since the City's construction of the drainage system, a substantially increased amount of water had begun to flow onto their property and that a permanent "retention pond" had formed in their backyard.

In count 1, the Wiggins sought an order quieting title to their property. The Wiggins acknowledged the existence of the storm-detention easement that encumbered the west and north sides of their parcel, but emphasized that they remained the fee owners of the property. The Wiggins contended that by constructing the drainage system, the City (and presumably the other named defendants) had asserted property interests adverse to their own. The Wiggins claimed that by asserting such adverse claims, the City and other named defendants had jeopardized and interfered with their interests in the property. The Wiggins asked the circuit court to quiet title in them.

In count 2, the Wiggins sought declaratory relief relating to the rights of the named defendants and the scope and extent of the existing storm-detention easement. The Wiggins requested a declaration that none of the named defendants had possessed any right to enter onto the Wiggins parcel, to excavate the trench on the Wiggins parcel, or to install the drainage pipe in question.

In count 3, the Wiggins alleged that the named defendants had trespassed on their property in two different ways. First, the Wiggins alleged that the City, Doan Enterprises, and the City's agents had physically trespassed on their property to excavate the ditch and install the drainage pipe. The Wiggins contended that the Heckmans and Mahlers had either specifically agreed to, or acquiesced in, this act of trespassing. Second, the Wiggins alleged that the City, the Heckmans, and the Mahlers had committed additional acts of trespass by improperly diverting surface waters onto the Wiggins parcel through the drainage pipe. The Wiggins sought an injunction requiring the removal of the drainage pipe and enjoining the further diversion of surface water onto their property. The Wiggins also sought money damages for the alleged trespasses that had already been committed.

In count 4, the Wiggins alleged that the presence of the drainage pipe and the diversion of surface water onto their property were conditions that unreasonably interfered with their use and enjoyment of the property. They asserted that these conditions constituted a nuisance. The Wiggins sought money damages as well as abatement of the alleged nuisance under MCL 600.2940.

Lastly, in count 5, the Wiggins claimed that the City's actions had resulted in an unconstitutional taking of a portion of their property without just compensation.

In December 2008, the circuit court granted the Wiggins leave to file a "Supplemental Complaint." In their supplemental complaint, the Wiggins clarified that they were asserting their trespass claim against the Heckmans and Mahlers, as well as the City. The Wiggins also clarified their argument that even though the Heckmans and Mahlers had not physically entered onto the Wiggins parcel, they were nonetheless liable for trespass because they had authorized the diversion of surface waters from their properties.

On April 20, 2009, the Mahlers filed a "MOTION FOR PARTIAL SUMMARY DISPOSITION AS TO MONEY DAMAGES" pursuant to MCR 2.116(C)(10). The Mahlers asserted that their *only* involvement with this entire case had been their act of giving the City permission to enter upon the Mahler parcel to construct a drain. Curiously, the Mahlers' sole legal argument was that the Wiggins had not established a prima facie case of negligence against them. However, as noted previously, the Wiggins never pleaded a claim of negligence against the Mahlers.[3]

Also on April 20, 2009, the City filed its own motion for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). Among other things, the City argued that the Wiggins' claims should be dismissed "because the Office of the Genesee County Drain Commissioner approve[d] of the placement of the drainage pipe" and because the Wiggins' claims were "barred by governmental immunity." The City argued that the construction of the drainage pipe on the Wiggins parcel and the diversion of excess surface waters from the Heckman

---

[3] Three days later, the Heckmans filed their own "motion for partial summary disposition as to money damages" pursuant to MCR 2.116(C)(10), adopting and fully concurring in the motion filed by the Mahlers.

and Mahler parcels were both within the scope of the preexisting storm-water-detention easement that encumbered the Wiggins' property. The City further pointed out that the Wiggins were fully aware of the storm-detention easement encumbering their parcel at the time they purchased it. Accordingly, the City contended that the Wiggins had no right to complain about the construction of the drain or the diversion of surface water onto their property, both of which were within the contemplation of the parties at the time the Wiggins bought the property.

The City additionally argued that, pursuant to § 192 of the Land Division Act, MCL 560.192, the drainage of storm water in a subdivision is within the exclusive jurisdiction and control of the county drain commissioner. The City asserted that because the Genesee County Drain Commissioner had approved the creation of the storm-water-detention easement at the time Maplewood Meadows No. 1 was first platted, and because the Genesee County Drain Commissioner had also approved the construction of the drain leading from the Heckman and Mahler parcels to the Wiggins parcel, the Wiggins' claims against the City should all fail as a matter of law.[4]

With respect to the Wiggins' quiet-title claim, the City argued that the claim was in reality an attempt to revise a recorded plat. According to the City, because the Wiggins had not proceeded in accordance with certain requirements set forth in the Land Division Act, MCL 560.101 *et seq.*, their mislabeled quiet-title claim

---

[4] The Mahlers filed a motion partially concurring in the City's motion for summary disposition. The Mahlers agreed with the City's contention that the Wiggins' claims should fail as a matter of law because the drainage project at issue in this case had been approved by the Genesee County Drain Commissioner.

should be dismissed. And with regard to the Wiggins' trespass and nuisance claims, the City argued that they should be dismissed on the basis of governmental immunity. The City asserted that by constructing the drain to divert excess surface water from the Heckman and Mahler parcels, it had been engaged in the exercise of a governmental function within the meaning of § 7 of the governmental tort liability act (GTLA), MCL 691.1407(1). The City also pointed out that the Michigan Supreme Court had abolished the common-law trespass-nuisance exception to governmental immunity in *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002).

The Wiggins responded to defendants' motions for summary disposition and requested summary disposition in their favor pursuant to MCR 2.116(I)(2). The primary argument raised by the Wiggins was that although the storm-detention easement encumbering their property required them to accept the surface waters that naturally flowed into the area of the easement, defendants had possessed no right to construct the drain at issue in this case, which artificially increased and concentrated the amount of water flowing onto the Wiggins parcel.

The Wiggins pointed out that the Heckmans' and Mahlers' motions addressed the issue of "negligence" only, but that no negligence claim had ever been pleaded against any of the defendants. The Wiggins noted that the Mahlers and Heckmans had not even addressed the trespass, nuisance, and quiet-title claims in their motions for partial summary disposition. With regard to the City's motion for summary disposition, the Wiggins argued that the drainage pipe constructed by the City was *not* within the scope of the preexisting storm-detention easement. The Wiggins acknowledged that

the area encumbered by the storm-detention easement was required to receive the natural surface runoff from the neighboring parcels, but argued that none of the defendants was authorized to artificially increase and concentrate the flow of surface water through the use of pipes or drains. The Wiggins contended that, in light of the plain language creating the easement on the final plat of Maplewood Meadows No. 1, "[t]he scope of the private easement for storm detention was . . . limited to the accommodation of surface water matriculating to the detention basin by only natural means and courses." The Wiggins also asserted that the City had improperly failed to comply with the Drain Code, MCL 280.1 *et seq.*, when it undertook to construct the drain at issue in this case. The Wiggins noted that they had no objection to the Heckmans and Mahlers obtaining some type of drainage relief for their flooding problems in general, but asserted that the City had provided drainage relief for the Heckmans and Mahlers in an unlawful manner by diverting all the surface water from the Heckman and Mahler properties to the Wiggins property.

In reply, and without any supporting authority, the City argued that the storm-detention easement encumbering the Wiggins parcel fell within the definition of "drain" contained in § 3 of the Drain Code, MCL 280.3. The City also contended that the storm-sewer plan for Maplewood Meadows No. 1 supported its position that the storm-detention easement was required to accept all surface-water runoff from the Heckman and Mahler parcels. The City pointed out that, at the time Maplewood Meadows No. 1 was initially platted, the plattors apparently intended to drain all surface waters collected in the area of the storm-detention easement into the subdivision's storm sewers. The City submitted a map of the originally proposed storm-sewer plan for

Maplewood Meadows No. 1.[5] The City contended that the subdivision's storm-sewer plan, which envisioned a drain leading from the area of the storm-detention easement to the storm sewers, belied the Wiggins' argument that the installation of a drainage system was not within the scope of the storm-detention easement.

The City then argued that the drain at issue in this case had not increased the historical and natural flow of water from the Heckman and Mahler parcels to the Wiggins parcel. The City contended that, in the state of nature, all surface waters had historically flowed from the Heckman and Mahler parcels to the Wiggins property. According to the City, however, the construction of Maplewood Meadows No. 1 had somehow altered this historical and natural flow of surface waters, causing the surface waters to stop flowing from the Heckman and Mahler parcels, and instead to begin collecting on those parcels. The City argued that the installation of the drain leading to the Wiggins parcel had merely reestablished the historical and natural flow of surface waters into the area of the storm-detention easement, and that "from a hydrologic standpoint, the surface water from the Heckman and Mahler properties is currently going where it historically went."

The circuit court held a hearing on the parties' motions for summary disposition. The City argued that it was entitled to governmental immunity with respect to the Wiggins' claims. The circuit court noted that the Wiggins had also pleaded an eminent-domain claim, and that the City would not be entitled to immunity with regard to this takings claim. The court looked to

---

[5] It is not clear whether the proposed storm sewers were ever constructed in Maplewood Meadows No. 1 or whether the storm-detention easement was ever connected to the subdivision's storm sewers as apparently intended by the plattors.

the dictionary definitions of the words "drain" and "retain" and observed that the two words had two different meanings. The court then remarked that it had read the Drain Code, but that the words "retain" and "retention" are not contained in the statute. The court questioned aloud whether the drain at issue in this case was governed by the Drain Code or within the jurisdiction of the county drain commissioner. The City's attorney commented that the drain commissioner had approved the creation of the storm-detention easement at the time he signed off on the final plat of Maplewood Meadows No. 1.[6] Therefore, according to the City, the storm-detention easement was part of the subdivision's overall drainage system and under the jurisdiction of the drain commissioner.

The circuit court posed a question to counsel for the City:

> What about the argument that . . . [w]hen the [d]etention easement was created, that it dealt with a natural flow, that which by the hands of Mother Nature and God would run into that basin, whereas now by man's act a pipe has been run into the basin creating more water than originally designed . . . ?

The City's attorney responded, "[F]irst of all, according to the contour map of the area prior to the construction of this subdivision, the water's going now where it naturally went; so, from a historical perspective, [the water] has not been diverted." The court agreed that "[t]here is a natural flow that's suggested in that topographical map," but noted that the Wiggins parcel "accepted that natural flow and everything was appropriate and understood until suddenly a pipe was put in.

---

[6] The county drain commissioner or governing body of the municipality must give final approval before the plat of a subdivision may be finalized and recorded. MCL 560.192.

Now, if the flow increases two or three years after [the Wiggins] move onto the property, that suggests that it's not the natural flow." The City's attorney responded that the Wiggins could not prove that the flow of water onto their property had been increased by the installation of the drain.

The Mahlers' attorney argued that her clients could not be held liable for trespass or nuisance because they had not entered upon the Wiggins property. She argued that the Mahlers had merely authorized or consented to the City's construction of the drain. She did not believe that this was sufficient to create liability on the part of her clients. The Heckmans' attorney made essentially the same argument.

The Wiggins' attorney argued that "when this easement was established there was never any intention that there was to be a drain installed where they ultimately installed it[.]" The Wiggins' attorney went on to argue that

> when the drain commissioner . . . approved the plat and when the people from the City of Burton approved the plat, the intention was, in fact, that this private easement for storm detention would accommodate the natural flow of water through the drainage system which is . . . evident within the plat itself.

The Wiggins' attorney fully admitted that his clients' parcel was encumbered by the "private easement for storm detention" shown on the final plat of Maplewood Meadows No. 1, but argued that the City and other defendants were attempting to unilaterally expand the scope of the easement from a storm-water-detention easement to a drainage easement. Counsel argued that such a unilateral expansion of the scope of the easement was impermissible and not within the contemplation of the parties at the time the easement was created. The

Wiggins' attorney concluded that "the existence of a detention [easement] does not give rise to the authority to install a drain."

After entertaining the attorneys' arguments, the circuit court announced that it had discovered § 75 of the Drain Code, MCL 280.75, during its research. The court read aloud from MCL 280.75, which provides in pertinent part:

> If all persons whose lands would be traversed or damaged by the proposed drain or drains shall not have executed a release of the right of way, and all damages on account thereof, within 60 days after the entry of the first order of determination, the commissioner shall, as soon as practicable, make application to the probate court of the county in which such lands are situated, for the appointment of 3 special commissioners, who shall be disinterested resident freeholders of the county, but not of the township or townships affected by such drain, to determine the necessity for the taking of private property for the use and benefit of the public, and the just compensation to be made therefor.

The circuit court asked the parties whether they had followed the procedures set forth in MCL 280.75. The parties confirmed that they had not. Counsel for the City asserted that the procedures set forth in MCL 280.75 were inapplicable to this case. She also asserted that because of Thomas Heckman's repeated complaints at city council meetings, the City was required to act quickly to resolve the drainage problem. Counsel suggested that the City would not have had time to follow the statutory procedures set forth in MCL 280.75. But the circuit court maintained that the procedures set forth in MCL 280.75 should have been followed before the drain was installed. The circuit court took the motions under advisement.

On June 29, 2009, the circuit court issued an opinion
and order (1) granting summary disposition in favor of
the Mahlers and the Heckmans, (2) denying the Wig-
gins' motion for summary disposition, and (3) dismiss-
ing all claims against the City "without prejudice so
that the [Wiggins] and the City . . . can follow the
procedure . . . laid out in MCL 280.75." With regard to
the Heckmans and Mahlers, the circuit court deter-
mined that their only affirmative act had been a request
for drainage relief from the City. The court noted that
neither the Heckmans nor the Mahlers had personally
trespassed on the Wiggins parcel. The court ruled that
"merely requesting relief from a city is not sufficient to
rise to the level of trespass or nuisance," and therefore
dismissed all claims against the Heckmans and Mahl-
ers. With respect to the City, the circuit court assumed
for the sake of argument that the storm detention
easement encumbering the Wiggins parcel was "in
actuality a drain easement." However, relying on § 6 of
the Drain Code, MCL 280.6, and *Toth v Waterford Twp*,
87 Mich App 173; 274 NW2d 7 (1978), the court
observed that a local unit of government may not
significantly expand the scope of an existing drainage
easement. The court noted that there appeared to
remain a factual dispute concerning whether the City
had the authority to expand the scope of the existing
easement.

Nevertheless, the court went on to dispose of the
Wiggins' claims against the City on the basis of MCL
280.75, even though that statute had never been raised
by the parties. The court stated that MCL 280.75
"specifically lays out the procedure an aggrieved land-
owner is to use in a circumstance such as ours[.]" In the
end, the court "dismisse[d] the case against the City
without prejudice so that the [Wiggins] and the City can
follow the procedure as laid out in MCL 280.75."

The Wiggins timely filed a claim of appeal following the circuit court's ruling. The City has filed a claim of cross-appeal.

## II. STANDARDS OF REVIEW

The scope and extent of an easement is generally a question of fact that is reviewed for clear error on appeal. *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005); *Dobie v Morrison*, 227 Mich App 536, 541-542; 575 NW2d 817 (1998). Similarly, whether the scope of an easement has been exceeded is generally a question of fact. See *Bang v Forman*, 244 Mich 571, 576; 222 NW 96 (1928). However, when reasonable minds could not disagree concerning these issues, they should be decided by the court on summary disposition as a matter of law. See *Babula v Robertson*, 212 Mich App 45, 54; 536 NW2d 834 (1995). This Court reviews de novo a circuit court's grant or denial of a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

## III. CLAIMS AGAINST THE HECKMANS AND MAHLERS PERTAINING TO THE PHYSICAL DRAIN ITSELF

The Wiggins first challenge the circuit court's dismissal of their claims against the Heckmans and Mahlers pertaining to the construction and continuing presence of the drain itself. The Wiggins argue that the installation and physical presence of the drainpipe on their property constituted a trespass and a nuisance. The Wiggins assert that by authorizing or ratifying the City's installation of the drain, the Heckmans and Mahlers committed the torts of trespass and nuisance. The Wiggins also assert that the Heckmans and Mahl-

ers, through their actions, have asserted property interests adverse to their own. We consider these arguments in turn.

### A. TRESPASS AND NUISANCE

The Wiggins first contend that the installation, construction, and continuing presence of the physical drainpipe itself constitute a trespass and nuisance for which the Heckmans and Mahlers are liable. We agree that the installation and continuing presence of the drain constitute a trespass, but we find that they do not constitute a nuisance.

The language of an express easement is interpreted according to rules similar to those used for the interpretation of contracts. See *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003); *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 283 Mich App 115, 129-130; 770 NW2d 359 (2009), rev'd in part on other grounds 488 Mich 69 (2010). Accordingly, in ascertaining the scope and extent of an easement, it is necessary to determine the true intent of the parties at the time the easement was created. *Hasselbring v Koepke*, 263 Mich 466, 477-478; 248 NW 869 (1933). Courts should begin by examining the plain language of the easement, itself. *Little*, 468 Mich at 700. If the language of the easement is clear, "it is to be enforced as written and no further inquiry is permitted." *Id*. A party's use of the servient estate "must be confined strictly to the purposes for which [the easement] was granted or reserved," *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957), and "must be confined to the plain and unambiguous terms of the easement," *Dyball v Lennox*, 260 Mich App 698, 708; 680 NW2d 522 (2004). The scope of an easement encompasses only those burdens

on the servient estate that were contemplated by the parties at the time the easement was created. *Bang*, 244 Mich at 576.

The language used in a plat is subject to similar rules of interpretation. "When interpreting . . . plats, Michigan courts seek to effectuate the intent of those who created them." *Tomecek v Bavas*, 482 Mich 484, 490-491; 759 NW2d 178 (2008) (opinion by KELLY, J.). "The intent of the plattors must be determined from the language they used and the surrounding circumstances." *Thies v Howland*, 424 Mich 282, 293; 380 NW2d 463 (1985). As occurred in the present case, an easement may be created by a subdivision plat. *Jeffery v Lathrup*, 363 Mich 15, 21-22; 108 NW2d 827 (1961); see also *Kirchen v Remenga*, 291 Mich 94, 108; 288 NW 344 (1939); 1 Cameron, Michigan Real Property Law (3d ed), § 6.7, p 220. The designation of an easement on a properly recorded plat "ha[s] all the force and effect of an express grant." *Kirchen*, 291 Mich at 109; see also *Forge v Smith*, 458 Mich 198, 209 n 29; 580 NW2d 876 (1998).

As noted earlier, and as shown on the final plat of Maplewood Meadows No. 1, the easement that encumbers portions of the Wiggins parcel and the four other adjacent lots is described as a "PRIVATE EASEMENT FOR STORM DETENTION." In other words, according to the plain language of the plat, the scope of the easement is limited to storm detention. We conclude that the language of this easement is clear and unambiguous, *Little*, 468 Mich at 700, and does not include within its scope the installation of the drain or drainpipe at issue in this case. The language of the storm-detention easement plainly limits the permissible uses of the servient estate to the retention or detention of waters that naturally flow to it as a result of storms. And while it could be argued that the surface water

diverted to the servient estate by way of the drain naturally falls on the Heckman and Mahler parcels as a result of storms, the text of the easement simply does not include any language relating to the installation of pipes or drains. See *Schmidt v Eger*, 94 Mich App 728, 738-739; 289 NW2d 851 (1980). If the plattors had desired to include within the scope of the easement the installation of pipes or drains leading onto the servient estate, they certainly could have included language to that effect in the easement at the time it was created. However, they did not. See *Jackson Community College Classified & Technical Ass'n, MESPA v Jackson Community College*, 187 Mich App 708, 714; 468 NW2d 61 (1991); *Montgomery v Taylor & Gaskin, Inc*, 47 Mich App 269, 275; 209 NW2d 472 (1973).

We find support for our conclusion in *Schmidt*. In that case, a drainage ditch carried surface-water runoff from the dominant estate onto the servient estate. *Schmidt*, 94 Mich App at 730-731. When the proprietors of the servient estate announced their intention to grade and level the portion of their property where the drain was located, the owner of the dominant estate sued, arguing among other things that the servient estate was encumbered by a drainage easement. *Id*. at 731, 738. The owner of the dominant estate pointed out that the instruments conveying the servient estate had contained "general language conveying [the servient estate] subject to easements reserved to the [the owner of the dominant estate] . . . ." *Id*. at 738. He argued that the express easements created by these instruments included within their scope the right to maintain the drainage ditch and to continue draining water onto the servient estate. *Id*.

However, the *Schmidt* Court rejected this argument, noting that the language of the express easements had

not even addressed the drain at issue in that case. *Id.* at 738-739. Indeed, the Court observed that while the instruments conveying the servient estate had "listed several specifically defined easements that were reserved to [the owner of the dominant estate]," the instruments of conveyance had "made no mention of the drain which is the subject of this appeal." *Id.* Accordingly, the *Schmidt* Court held that the continued operation and maintenance of the drainage ditch exceeded the scope of the easements.

As in *Schmidt*, the express storm-detention easement in this case "made no mention of the drain" in question. *Id.* Nor did the storm detention easement contain any other language relating to the issue of drainage in general. The plattors of Maplewood Meadows No.1 certainly could have included language relating to the issue of drainage in the text of the easement at the time it was created, but they did not. As explained previously, use of the servient estate "must be confined strictly to the purposes for which [the easement] was granted or reserved," *Delaney*, 350 Mich at 687, and "must be confined to the plain and unambiguous terms of the easement," *Dyball*, 260 Mich App at 708. Moreover, the scope of an easement encompasses *only* those burdens on the servient estate that were within the contemplation of the parties at the time the easement was created. *Bang*, 244 Mich at 576. We conclude that it is beyond factual dispute that the physical drain and drainpipe at issue in this case exceeded the scope of the "PRIVATE EASEMENT FOR STORM DETENTION" as delimited by the plain language of the easement itself. See *Schmidt*, 94 Mich App at 738-739.

The right to exclude others from one's property and the right to enjoy one's property are two distinct

possessory interests, "violations of which give rise to the distinct causes of action respectively of trespass and nuisance." *Adams v Cleveland-Cliffs Iron Co*, 237 Mich App 51, 58-59; 602 NW2d 215 (1999). "Historically, '[e]very unauthorized intrusion upon the private premises of another is a trespass . . . .' " *Id.* at 60 (alteration in original), quoting *Giddings v Rogalewski*, 192 Mich 319, 326; 158 NW 951 (1916). "Because a trespass violated a landholder's right to exclude others from the premises, the landholder could recover at least nominal damages even in the absence of proof of any other injury." *Adams*, 237 Mich App at 60. "Recovery for nuisance, however, traditionally required proof of actual and substantial injury. Further, the doctrine of nuisance customarily called for balancing the disturbance complained of against the social utility of its cause." *Id.* In other words, " '[t]respass was liability-producing regardless of the degree of harm the invasion caused, while nuisance required substantial harm as a liability threshold.' " *Id.* at 60 n 9 (citation omitted).

In certain jurisdictions, "it has become difficult to differentiate between trespass and nuisance" because "the line between trespass and nuisance has become 'wavering and uncertain.' " *Id.* at 64 (quotation marks and citations omitted). However, this Court has recognized a desire to "preserve the separate identities of trespass and nuisance." *Id.* at 65. Thus, in Michigan, "[r]ecovery for trespass to land . . . is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Id.* at 67. "Once such an intrusion is proved, the tort has been established, and the plaintiff is presumptively entitled to at least nominal damages." *Id.* In contrast, "[w]here the possessor of land is menaced by noise, vibrations, or ambient dust, smoke, soot, or fumes, the

possessory interest implicated is that of use and enjoyment, not exclusion, and the vehicle through which a plaintiff normally should seek a remedy is the doctrine of nuisance." *Id.* Unlike in the case of trespass, "[t]o prevail in nuisance, a possessor of land must prove *significant harm* resulting from the defendant's *unreasonable interference* with the use or enjoyment of the property." *Id.*

Turning to the present case, because the installation of the drain on the Wiggins parcel exceeded the scope of the storm-detention easement, it was necessarily "unauthorized." See *id.* Moreover, the installation of the drain was unquestionably a "direct . . . intrusion of a physical, tangible object" onto the Wiggins parcel. *Id.* Therefore, the installation of the drain on the Wiggins parcel constituted a trespass to property. *Id.*; see also *Schadewald v Brulé*, 225 Mich App 26, 40; 570 NW2d 788 (1997) (observing that "[a]ctivities by the owner of the dominant estate that go beyond the reasonable exercise of the use granted by the easement may constitute a trespass to the owner of the servient estate"). And because the drain at issue in this case constituted a tangible object, its presence on the Wiggins parcel was actionable in trespass rather than in nuisance. *Adams*, 237 Mich App at 69. In sum, it is beyond genuine factual dispute that the continuing presence of the drain itself—the installation of which plainly exceeded the scope of the storm-detention easement—constituted a trespass but not a nuisance under Michigan law.

Having concluded that the installation and presence of the drain on the Wiggins parcel constituted a continuing trespass (but not a nuisance) under Michigan law, it is necessary to determine whether the Heckmans and Mahlers may be held liable for this trespass and

what form of relief is available to the Wiggins. For the reasons that follow, we conclude that the Heckmans and Mahlers are liable in trespass for the unauthorized installation of the drain on the Wiggins parcel. The Wiggins may collect at least nominal damages from the Heckmans and Mahlers, and are additionally entitled to injunctive relief enjoining the Heckmans' and Mahlers' continuing trespass.

The circuit court observed that the Heckmans and Mahlers had not constructed the drain themselves and had not personally set foot on the Wiggins parcel. Instead, the circuit court noted, the Heckmans and Mahlers simply requested drainage relief from the City. The court ruled that "merely requesting relief from a city is not sufficient to rise to the level of trespass," and therefore granted summary disposition in favor of the Heckmans and Mahlers with respect to the trespass claim. We conclude that this ruling was in error. The Heckmans' and Mahlers' requests for drainage relief from the City, and subsequent authorization for the City or its agents to construct the drain in question, were sufficient acts to give rise to trespass liability. "It is a well-established principle of law that all persons who instigate, command, encourage, advise, ratify, or condone the commission of a trespass are cotrespassers and are jointly and severally liable as joint tortfeasors." *Kratze v Indep Order of Oddfellows, Garden City Lodge*, 190 Mich App 38, 43; 475 NW2d 405 (1991) (*Kratze I*), rev'd in part on other grounds 442 Mich 136 (1993); see also *Oyler v Fenner*, 264 Mich 519, 521; 250 NW 296 (1933); 87 CJS, Trespass, § 28, pp 744-745. It is beyond factual dispute that the Heckmans and Mahlers specifically requested drainage relief from the City and either authorized or subsequently ratified the installation of the drain and drainpipe by the City or its agents. This conduct by the Heckmans and Mahlers was sufficient to

constitute the intentional tort of trespass. *Kratze I*, 190 Mich App at 43. Moreover, the circuit court wholly disregarded the fact that the drain, once constructed and installed, belonged to the Heckmans and Mahlers rather than to the City. Indeed, as noted previously, the Heckmans and Mahlers signed documents with the City acknowledging that after the City had constructed and installed the drain leading from their respective properties to the Wiggins parcel, the drainage project would "belong solely to the [Heckmans and Mahlers] and will be the [Heckmans' and Mahlers'] responsibility to maintain/repair." We conclude that the circuit court erred by failing to grant summary disposition in favor of the Wiggins with regard to their trespass claim against the Heckmans and Mahlers pertaining to the physical presence of the drain itself.

Having determined that both the Heckmans and Mahlers are liable in trespass for the installation and continuing physical presence of the drain, we next consider what relief is available to the Wiggins vis-à-vis the Heckmans and Mahlers. It is well settled that a plaintiff who establishes the tort of trespass may recover money damages from the trespassing defendants. As noted earlier, once the tort of trespass has been established, "the plaintiff is presumptively entitled to at least nominal damages." *Adams*, 237 Mich App at 67. This is "because the violation of the right to exclude causes cognizable injury in and of itself . . . ." *Id.* at 72. Moreover, beyond the presumed, nominal damages, a plaintiff who establishes a trespass "may recover any additional, actual damages" as well. *Id.*

In addition to money damages, a plaintiff may be entitled to injunctive relief to enjoin a continuing trespass. It is true that " '[i]njunctive relief is an extraordinary remedy that issues only when justice requires,

there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury,' " and that "[g]ranting injunctive relief is within the sound discretion of the trial court." *Kernen v Homestead Dev Co*, 232 Mich App 503, 509; 591 NW2d 369 (1998), quoting *Jeffrey v Clinton Twp*, 195 Mich App 260, 263-264; 489 NW2d 211 (1992). The general rule " 'is that the court will balance the benefit of an injunction to plaintiff against the inconvenience and damage to defendant, and grant an injunction or award damages as seems most consistent with justice and equity under all the circumstances of the case.' " *Kratze v Indep Order of Oddfellows*, 442 Mich 136, 143 n 7; 500 NW2d 115 (1993) (*Kratze II*), quoting *Hasselbring*, 263 Mich at 480. But "a court is not bound to engage in a balancing of the relative hardships and equities if the encroachment resulted from an intentional or wilful act . . . ." *Kratze II*, 442 Mich at 145. This Court has held that when a trespass "is of a permanent or continuous character," injunction "is an appropriate remedy." *Schadewald*, 225 Mich App at 40. Thus, for example, when certain defendants committed a trespass and exceeded the scope of their easement by impermissibly installing a sewer line across the servient estate, this Court affirmed the circuit court's permanent injunction prohibiting the defendants' use of the sewer line and requiring them to remove it. *Soergel v Preston*, 141 Mich App 585, 589-590; 367 NW2d 366 (1985). Similarly, in *Schadewald*, 225 Mich App at 39-40, the defendants committed a trespass by utilizing an easement encumbering the servient estate for a use that was not contemplated by the parties at the time the easement was created. This Court held that by expanding their use of the easement, the defendants had committed a "continuing trespass for which damages would be difficult to measure"; accordingly, the Court

remanded the matter to the circuit court with instructions to enter an injunction prohibiting the defendants' impermissible use of the easement. *Id.* at 40.

With respect to the drain at issue in the present case, it is clear that the Wiggins are entitled to at least nominal damages, and additionally any actual damages, resulting from the Heckmans' and Mahlers' trespass. It is also clear that the drain, which has already been installed on the Wiggins parcel, constitutes a trespass of a permanent and continuing nature. See *id.* Accordingly, the Wiggins are entitled to the entry of injunctive relief enjoining the Heckmans' and Mahlers' use of the drain and requiring the Heckmans and Mahlers to remove that portion of the drain that touches or encroaches on the Wiggins property.

In sum, we reverse the circuit court's grant of summary disposition in favor of the Heckmans and Mahlers with respect to the Wiggins' trespass claim pertaining to the drain itself and remand for entry of judgment in favor of the Wiggins on this claim. On remand, the circuit court shall enter an injunction enjoining the Heckmans' and Mahlers' use of the drain and requiring the Heckmans and Mahlers to remove that portion of the drain that touches or encroaches on the Wiggins parcel.[7] See *id.*; see also *Soergel*, 141 Mich App at 589-590. The court shall also conduct further proceedings to determine the appropriate amount of damages owed by the Heckmans and Mahlers as a result of this trespass.

---

[7] We reiterate that the Heckmans and Mahlers—and not the City—are the owners of the trespassing drain. As explained previously, the Heckmans and Mahlers signed documents with the City acknowledging that after the City had constructed and installed the drain, the drainage project would "belong solely to the [Heckmans and Mahlers] and will be the [Heckmans' and Mahlers'] responsibility to maintain/repair."

B. DECLARATORY RELIEF

We also conclude that the circuit court erred by failing to consider the Wiggins' request for declaratory relief as it related to the Heckmans and Mahlers. Although it has become commonplace in this state for a plaintiff to assert a request for declaratory relief as a separately labeled cause of action within his or her complaint, this is technically improper because "declaratory relief is a remedy, not a claim." *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 223; 761 NW2d 293 (2008); see also MCR 2.605(A). Nevertheless, a complaint must be read as a whole, and it is well settled that this Court will look beyond the mere procedural labels used in the pleadings. *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710-711; 742 NW2d 399 (2007). It is clear that, although the Wiggins' request for declaratory relief was incorrectly pleaded as a separate cause of action rather than as a prayer for relief, the Wiggins intended their request for declaratory relief to encompass the Heckmans and Mahlers in addition to the City. A careful examination of the complaint indicates that the Wiggins requested

> Declaratory Relief determining and declaring that *no Defendant named in this action* possesses any right, title, or interest in the Wiggins Property that would allow or authorize *any Defendant* to enter upon Plaintiffs' private property and excavate land, soil and turf and effect the installation of a drainage pipe . . . . [Emphasis added.]

Therefore, the circuit court erroneously stated in its opinion and order that "[t]he Mahler and Heckman Defendants are not parties to the [Wiggins'] request-. . . for Declaratory Relief . . . ." We reverse this portion of the circuit court's opinion and order, and remand for the entry of appropriate declaratory relief with respect to the Wiggins' underlying claims. On remand, the

circuit court shall declare at a minimum that the installation and construction of the drain exceeded the scope of the storm-detention easement encumbering the Wiggins parcel, see *Schmidt*, 94 Mich App at 738-739, and that the Heckmans and Mahlers committed a trespass by authorizing or ratifying the City's construction of the drain.

### C. QUIET TITLE

We also conclude that the circuit court properly declined to consider the Wiggins' quiet-title claim as it related to the Heckmans and Mahlers. Our review of the complaint has established that the Wiggins asserted their quiet-title claim against the City only, and not against the Heckmans and Mahlers. The circuit court was therefore correct when it stated in its opinion and order that "[t]he Mahler and Heckman Defendants are not parties to the [Wiggins'] request to quiet title . . . ." Because the quiet-title claim was never asserted against the Heckmans and Mahlers, the circuit court did not err by failing to consider the claim in relation to those defendants.

### IV. CLAIMS AGAINST THE HECKMANS AND MAHLERS PERTAINING TO THE FLOW OF WATER

The Wiggins do not merely argue that the installation and continuing physical presence of the drain constituted a trespass or a nuisance. They also argue with equal force that the increased flow of water onto their land through the drain—wholly separate and apart from the presence of the drain itself—constitutes a trespass and a nuisance. Many of the same rules applicable to our earlier discussion are also applicable here. However, there are also different rules of law,

governing the matter of surface-water flow, which now become relevant to our analysis.

## A. TRESPASS AND NUISANCE

Although the flow of water onto the Wiggins parcel through the drain in question did not constitute a nuisance, we conclude that there remained a genuine issue of material fact concerning whether the flow of water constituted an actionable trespass.

It has been "the settled law of this State" for more than a century that the natural flow of surface waters from the upper, dominant estate forms a "natural servitude" that encumbers the lower, servient estate. *Carley v Jennings*, 131 Mich 385, 387; 91 NW 634 (1902); *Leidlein v Meyer*, 95 Mich 586, 589; 55 NW 367 (1893); see also *O'Connor v Hogan*, 140 Mich 613, 624; 104 NW 29 (1905); *Terlecki v Stewart*, 278 Mich App 644, 661; 754 NW2d 899 (2008); *Reed v Soltys*, 106 Mich App 341, 349; 308 NW2d 201 (1981). The owner of the lower, servient estate must bear this natural servitude, and is bound by law to accept the natural flow of surface waters from the upper, dominant estate. *Bennett v Eaton Co*, 340 Mich 330, 335-336; 65 NW2d 794 (1954); *Launstein v Launstein*, 150 Mich 524, 526; 114 NW 383 (1907); *Cranson v Snyder*, 137 Mich 340, 343; 100 NW 674 (1904); *Lewallen v City of Niles*, 86 Mich App 332, 334; 272 NW2d 350 (1978). It is similarly well settled, however, that "the owner of the upper estate has no right to increase the amount of water that would otherwise naturally flow onto the lower estate." *Kernen*, 232 Mich App at 512. For instance, it has been said that the owner of the upper estate "cannot, by artificial drains or ditches, collect the waters of . . . his premises, and cast them in a body upon the proprietor below him to his injury." *Gregory v Bush*, 64 Mich 37,

42; 31 NW 90 (1887). Nor may the owner of the upper estate "concentrate [the surface] water, and pour it through an artificial ditch or drain, in unusual quantities and greater velocity, upon an adjacent proprietor." *Peacock v Stinchcomb*, 189 Mich 301, 307; 155 NW 349 (1915); see also *Miller v Zahn*, 264 Mich 306, 307; 249 NW 862 (1933). Stated another way, "the owner of the dominant estate may not, by changing conditions on his land, put a greater burden on the servient estate by increasing and concentrating the volume and velocity of the surface water." *Lewallen*, 86 Mich App at 334.[8]

By way of example, in *Schmidt*, 94 Mich App at 738, the trial testimony established that "as a result of the development of [the dominant estate], the water runoff onto [the servient estate] was greatly increased, perhaps as much as six times the natural flow." The *Schmidt* Court stated the general rule:

> It is clear that the owner of the lower or servient estate must accept surface water from the upper or dominant estate in its natural flow, and equally clear that the owner of the dominant estate may not require the owner of the servient estate to accept a greater runoff by increasing or concentrating the flow. [*Id.*]

Because the owner of the dominant estate did not have an easement that permitted him to cast such "greatly increased" amounts of surface water upon the servient estate, this Court determined that he had exceeded the scope of the natural servitude that encumbered the servient estate and therefore affirmed the circuit

---

[8] Although these common-law rules were originally developed for use in rural settings, see *Village of Trenton v Rucker*, 162 Mich 19, 22-23; 127 NW 39 (1910); *Boyd v Conklin*, 54 Mich 583, 588-589; 20 NW 595 (1884), it now appears settled that the same rules apply within the boundaries of municipalities as well, see *Steele v City of Ionia*, 209 Mich 595, 599; 177 NW 259 (1920); see also *Robinson v Wyoming Twp*, 312 Mich 14, 24-25; 19 NW2d 469 (1945).

court's entry of judgment in favor of the proprietors of the servient estate. *Id*. at 738-739.

As these rules make clear, the Wiggins parcel is required to accept the surface-water runoff that naturally flows to it from the neighboring dominant estates. After all, as noted earlier, the natural flow of surface waters from the upper, dominant estate forms a "natural servitude" which arises by operation of law and encumbers the lower, servient estate. *Carley*, 131 Mich at 387. But, as in *Schmidt*, the dominant estates in the present case have no right to cast upon the Wiggins parcel more surface water than would naturally flow to it. Upon examining the plain language of the storm-detention easement, it is clear that the easement merely requires the servient estate to retain those waters that naturally flow to it as a result of "storm[s]," i.e., precipitation. As our Supreme Court has observed, "surface waters are commonly understood to be waters on the surface of the ground, *usually created by rain or snow* . . . ." *Fenmode, Inc v Aetna Cas & Surety Co*, 303 Mich 188, 192; 6 NW2d 479 (1942) (emphasis added). Giving a commonsense reading to the language of the storm-detention easement at issue in this case, see *Holley v Schneider*, 422 Mich 248, 253; 369 NW2d 857 (1985), it is apparent that the easement requires only that the servient estate detain or retain those surface waters that naturally flow to it from the dominant estates.

The Wiggins assert that by authorizing the installation of the drain at issue in this case, the Heckmans and Mahlers have increased the amount of water which would otherwise naturally flow onto the servient estate, and have therefore exceeded the scope of both the express storm-detention easement and the implied natural servitude encumbering the Wiggins parcel.

While it is certainly true that the drain casts some water onto the servient estate (after all, this was the purpose for which the drain was constructed), it is not clear whether the amount of water cast onto the Wiggins parcel through the drain exceeds the natural amount of surface water that has otherwise historically flowed to the property. While it is true that the City submitted to the circuit court a hydrogeologic contour map that purportedly showed the historical flow of surface waters in the area of Maplewood Meadows No. 1, this documentary evidence was not conclusive. Nor was the evidence given by the City's engineer or the affidavit of an employee of the drain commissioner's office conclusive on this matter. We conclude that there remained a genuine issue of material fact concerning whether the amount of water cast onto the Wiggins parcel through the drain exceeds the amount of surface water that has otherwise naturally and historically flowed to the Wiggins parcel from the dominant estates. The circuit court will be required to conduct further proceedings on remand with respect to this issue.

If it is determined on remand that the flow of surface water onto the Wiggins parcel *has been materially increased* beyond that which has historically and naturally flowed to it from the dominant estates, this will constitute an independent trespass to the Wiggins parcel. It is beyond dispute that a defendant's unauthorized act of causing excess waters to flow onto another person's property constitutes a trespass. See *Herro v Chippewa Co Rd Comm'rs*, 368 Mich 263, 265, 272; 118 NW2d 271 (1962); *Davis v Frankenlust Twp*, 118 Mich 494, 496; 76 NW 1045 (1898). This is because the unauthorized flooding of another person's land constitutes "an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Adams,*

237 Mich App at 67. As noted previously, once such an unauthorized intrusion is proved, the tort of trespass has been established, and "the plaintiff is presumptively entitled to at least nominal damages." *Id.* For these same reasons, the flow of excess waters onto the Wiggins parcel will not be actionable in nuisance because water is a physical, tangible object. See *id.*

And as stated earlier, "[i]t is a well-established principle of law that all persons who instigate, command, encourage, advise, ratify, or condone the commission of a trespass are cotrespassers and are jointly and severally liable as joint tortfeasors." *Kratze I,* 190 Mich App at 43. Thus, if it is determined following remand that the flow of surface water onto the Wiggins parcel has been materially increased beyond that which naturally flowed to it from the dominant estates, the Heckmans and Mahlers will be liable for this independent trespass onto the Wiggins parcel, and the Wiggins will be entitled to at least nominal damages from the Heckmans and Mahlers. *Adams,* 237 Mich App at 67. The Wiggins will also be entitled to injunctive relief. *Perry v Reed,* 147 Mich 146, 147; 110 NW 529 (1907) (stating that " '[i]t is . . . well settled that where one person does damage to another by flooding his lands . . . the party aggrieved may enjoin him by a decree in chancery, and in the 'same case have damages assessed for his injury' ") (citation omitted).

### B. DECLARATORY RELIEF

In addition to seeking declaratory relief with respect to the installation and continuing physical presence of the drain itself, the Wiggins also sought declaratory relief with respect to the alleged increased flow of water onto their property. Consequently, if it is determined following remand that the flow of surface water onto

the Wiggins' property has been materially increased beyond that which naturally flowed to it from the dominant estates, the circuit court shall declare that this increased flow exceeds the scope of the express storm-detention easement and the natural servitude encumbering the Wiggins parcel, and shall declare that the Heckmans and Mahlers committed an additional trespass by causing or authorizing this increased flow of water.

### V. CLAIMS AGAINST THE CITY

The Wiggins also argue that the circuit court erred by dismissing their claims against the City and by relying on the statutory procedures set forth in § 75 of the Drain Code, MCL 280.75. We agree that the circuit court erred by relying on MCL 280.75. We also agree that the circuit court erred by dismissing the Wiggins' inverse-condemnation claim, at least in part. However, with respect to the Wiggins' tort claims against the City, we remand for a determination whether the City is entitled to governmental immunity.

### A. THE DRAIN CODE

As explained previously, the circuit court ultimately dismissed all claims against the City "without prejudice so that the [Wiggins] and the City can follow the procedure . . . laid out in MCL 280.75." MCL 280.75 provides in its entirety:

> If all persons whose lands would be traversed or dam-aged by the proposed drain or drains shall not have executed a release of the right of way, and all damages on account thereof, within 60 days after the entry of the first order of determination, the [drain] commissioner shall, as soon as practicable, make application to the probate court of the county in which such lands are situated, for the

appointment of 3 special commissioners, who shall be disinterested resident freeholders of the county, but not of the township or townships affected by such drain, to determine the necessity for the taking of private property for the use and benefit of the public, and the just compensation to be made therefor. Such application shall be in writing, and shall set forth:

First, The fact that a petition for a drain was made and when, filing with said court a certified copy of such petition, also giving the route, survey and specifications of said drain as set forth in the first order of determination;

Second, That an order determining the necessity for such drain was made by the commissioner or drainage board, giving the time when such order was made, in accordance with such route, survey and specification, as above set forth;

Third, (1) The several descriptions or tracts of land with the names of the owner or owners of every such tract who have refused or neglected to execute a release of right of way and damages in any way arising or incident to the opening or maintaining the said proposed drain (2) the several descriptions or tracts of land owned by any minor, incompetent person, unknown persons or nonresidents of the township or townships, the execution of a release of right of way and damages for which have been neglected or refused; (3) it shall not be necessary to set forth in said application to the probate court the names of the several owners nor the description of the several tracts or parcels of land liable to an assessment for benefits, in case the drain applied for should be located and established, except those who have not released the right of way and through whose lands the drain passes; nor shall the same be included in the citation issued from the probate court.

MCL 280.75 is contained in chapter 4 of the Drain Code, MCL 280.71 *et seq*. Reading the statutes contained in chapter 4 together and in harmony with one another, see *People v Stephan*, 241 Mich App 482, 497-498; 616 NW2d 188 (2000), it is clear that the

procedures set forth in MCL 280.75 apply only to *proposed* drains and not to drains that are already in existence. See MCL 280.73. Moreover, it is clear that the procedures set forth in MCL 280.75 do not come into play until "[a]fter a drainage district has been established," MCL 280.71, after the drain commissioner has "endeavor[ed] to secure from the owners of each parcel or tract of land to be traversed or damaged by the proposed drain or drains an easement or release of right of way," MCL 280.73, after "a petition for [the] drain" has been filed, MCL 280.75, and after "an order determining the necessity for such drain" has been made by the drain commissioner or drainage board, MCL 280.75. None of these statutory prerequisites was ever realized in the instant case, and we conclude that the relevant procedures set forth in MCL 280.75 consequently never came into play.

In addition, it is unclear to us how the City and the Wiggins would be able to follow the procedures set forth in the Drain Code at this point in time when the proper authorities never sought to establish the drain under the Drain Code in the first instance. In essence, the parties would have to "start over" even though the drain is already in existence. The circuit court's determination that the parties should effectively start over and follow the relevant procedures set forth in MCL 280.75 does not strike us as a logical result. We conclude that the better course is to remand this matter to the circuit court with instructions to enter an injunction requiring the Heckmans and Mahlers to remove the drain. If the City then wishes to reestablish the drain after the drain is removed pursuant to this injunction, the parties will be better positioned to follow the procedures set forth in the Drain Code for establishing and constructing new drains.

In sum, we conclude that the circuit court erred by dismissing all claims against the City on the basis of the procedures set forth in MCL 280.75. Under the particular circumstances of this case, the statutory procedures of MCL 280.75 do not apply.

### B. INVERSE CONDEMNATION

We next conclude that there remained a genuine issue of material fact concerning whether the City's installation of the drain itself constituted a taking of private property without just compensation. Both the United States and Michigan constitutions prohibit the taking of private property for public use without just compensation. US Const, Am V; Const 1963, art 10, § 2; *Dorman v Clinton Twp*, 269 Mich App 638, 645; 714 NW2d 350 (2006). However, "[n]o precise formula exists" for determining whether a governmental invasion or intrusion constitutes a taking of private property. *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2004). Instead, several factors must be considered. *Id.* "Further, a plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages." *Id.* It has been said that "[a] plaintiff alleging a de facto taking or inverse condemnation must prove 'that the government's actions were a *substantial* cause of the decline of his property's value' and also 'establish the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property.' " Id., quoting *Heinrich v Detroit*, 90 Mich App 692, 700; 282 NW2d 448 (1979). "While there is no exact formula to establish a de facto taking, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of

limiting the use of the property." *Charles Murphy, MD, PC v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993).

It is clear that the construction and installation of the drain itself was an affirmative act by the City or its agents, specifically directed toward the Wiggins' property, which had the effect of limiting the use of the Wiggins parcel. *Id*. What is not clear is how much damage was caused by the City's installation of the drain and whether the City's actions were " 'a *substantial* cause of the decline of [the Wiggins parcel's] value.' " *Hinojosa*, 263 Mich App at 548, quoting *Heinrich*, 90 Mich App at 700. Accordingly, on remand, the circuit court will be required to conduct further proceedings concerning the Wiggins' inverse-condemnation claim to (1) determine whether the installation of the drain itself constituted a de facto taking at all (i.e., whether the construction and installation of the drain was a substantial cause of a decline in the Wiggins parcel's value) and (2) if it did constitute a de facto taking, determine the proper amount of compensation payable to the Wiggins by the City.

In contrast, we conclude that any material increase in the flow of water through the drain—even if established on remand—could *not* have constituted a taking as a matter of law. It is well settled that a governmental actor may cause a taking of private property by flooding the property or diverting excess surface water onto the property. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 189 n 16; 521 NW2d 499 (1994); see also *Herro*, 368 Mich at 275. However, as noted earlier, ownership of the drain and drainage system was transferred to the Heckmans and Mahlers immediately upon the City's completion of the project. In other words, because any flooding of the Wiggins parcel necessarily occurred *after* the drainage project was completed, the

City no longer owned the drain at the time. "[I]t is elementary that an inverse condemnation action— being based upon the taking or damaging of property for public use without just compensation—requires state action and, therefore, cannot be asserted against private parties." *Bach v Butte Co*, 215 Cal App 3d 294, 307; 263 Cal Rptr 565 (1989). Thus, while the City may well be liable in inverse condemnation for its construction and installation of the physical drain itself, the City can have no inverse-condemnation liability arising out of the flow of water through the privately owned drain.

## C. GOVERNMENTAL TORT IMMUNITY

The circuit court did not reach the issue of the City's liability on the Wiggins' remaining tort claims, choosing instead to dismiss these claims against the City without prejudice on the basis of MCL 280.75. We have already concluded that the circuit court's reliance on MCL 280.75 was erroneous.

The City argues that even if the circuit court improperly invoked the Drain Code to dismiss the Wiggins' claims, it is entitled to governmental immunity. As the City points out, our Supreme Court has made clear that the tort immunity granted to governmental entities is broad, and that there is no trespass-nuisance exception to governmental immunity. *Pohutski*, 465 Mich at 689-690. In addition, none of the six statutory exceptions to governmental immunity appears to apply in this case. See MCL 691.1407(1); *Lash v Traverse City*, 479 Mich 180, 195; 735 NW2d 628 (2007). However, as the Wiggins correctly observe, the question of the City's entitlement to governmental immunity was not decided by the circuit court, and issues not decided below are generally considered unpreserved for appellate review. *Candelaria v B C Gen Contractors, Inc*, 236 Mich App 67,

83; 600 NW2d 348 (1999). We decline to address this issue for the first time on appeal. *Id.*

On remand, the circuit court will be required to consider whether the City is entitled to governmental immunity with respect to the Wiggins' tort claims.[9] Specifically, the circuit court will be required to decide whether governmental immunity insulates the City only from the Wiggins' claims for money damages, see *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139, 152 n 5; 422 NW2d 205 (1988) (opinion by BRICKLEY, J.) (stating that "[g]enerally, we do not view actions seeking only equitable relief, such as abatement or injunction, as falling within the purview of governmental immunity"), overruled on other grounds by *Pohutski*, 465 Mich at 678-679, or whether governmental immunity bars *all* of the Wiggins' tort claims against the City, including those seeking only injunctive, declaratory, or other equitable relief, see *Jackson Co Drain Comm'r v Village of Stockbridge*, 270 Mich App 273, 284; 717 NW2d 391 (2006) (holding that "[t]he plain language of the [governmental immunity] statute does not limit the immunity from tort liability to liability for [money] damages"). The circuit court should also consider whether our Supreme Court's decision in *Lash* has had any effect on the abovementioned holding of *Jackson Co Drain Comm'r.* See *Lash*, 479 Mich at 196 (noting that although the plaintiff could not enforce certain statutory requirements by maintaining a cause of action for money damages against the governmental defendant, he "could enforce the statute by seeking injunctive relief . . . or declaratory relief").

---

[9] Naturally, the City is not entitled to governmental immunity with respect to the Wiggins' inverse-condemnation claim. *Electro-Tech, Inc v H F Campbell Co*, 433 Mich 57, 91 n 38; 445 NW2d 61 (1989).

VI. CONCLUSION

We affirm the circuit court's dismissal of the Wiggins' nuisance claim against the Heckmans and Mahlers. We also affirm the circuit court's determination that the Heckmans and Mahlers were not parties to the Wiggins' quiet-title claim.

However, we reverse the circuit court's dismissal of the Wiggins' trespass claim against the Heckmans and Mahlers. By authorizing or ratifying the City's installation of the drain itself, the Heckmans and Mahlers committed a trespass as a matter of law. Moreover, there remained a genuine issue of material fact concerning whether the alleged increased flow of water onto the Wiggins parcel constituted an additional trespass by the Heckmans and Mahlers. We also reverse the circuit court's determination that the Heckmans and Mahlers were not parties to the Wiggins' request for declaratory relief.

On remand, the circuit court shall declare that the Heckmans and Mahlers trespassed on the Wiggins parcel as a matter of law by authorizing or ratifying the City's installation of the drain. The court shall also take additional evidence and conduct further proceedings concerning (1) whether the alleged increased flow of water onto the Wiggins parcel constituted an additional trespass by the Heckmans and Mahlers, and (2) the appropriate amount of damages owed by the Heckmans and Mahlers for trespassing on the Wiggins parcel. At a minimum, the court shall award the Wiggins nominal damages for all trespasses committed by the Heckmans and Mahlers, shall enter injunctive relief directing the Heckmans and Mahlers to remove the drain, and shall grant other declaratory relief consistent with this opinion.

We reverse the circuit court's dismissal of the Wig-

gins' claims against the City on the basis of MCL 280.75. The circuit court erred as a matter of law by relying on the Drain Code to dispose of those claims. There remained a genuine issue of material fact concerning whether the City's installation of the drain itself constituted a taking of the Wiggins' private property without just compensation. On remand, the circuit court shall take additional evidence and conduct further proceedings concerning the Wiggins' inverse-condemnation claim consistent with this opinion. The circuit court shall also consider and decide whether the City is entitled to governmental immunity with respect to the Wiggins' tort claims against it. If the court determines that the City is entitled to governmental immunity with respect to the Wiggins tort claims, it shall dismiss the claims on that basis. On the other hand, if the court determines that any of the tort claims against the City (such as those seeking only injunctive or declaratory relief) are not barred by governmental immunity, it shall conduct further proceedings concerning those surviving claims.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs under MCR 7.219, a public question having been involved.