*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WATERFALL HILL CONDOMINIUM
ASSOCIATION,

UNPUBLISHED
December 5, 2019

Plaintiff-Counterdefendant-
Appellee,

v

No. 343673
Oakland Circuit Court
LC No. 2017-157021-CH

GREAT LAKES CUSTOM BUILDER, LLC,

Defendant-Counterplaintiff-
Appellant.

Before: JANSEN, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

In this property dispute, defendant appeals as of right following a bench trial. After determining that defendant exceeded the terms of an easement and trespassed on plaintiff's property, the trial court ordered defendant to remove the driveway overage and electronic gate on plaintiff's property. Pretrial, the trial court granted plaintiff partial summary disposition based on its determination that the amendment of the easement superseded the original easement. Defendant challenges the trial court's rulings. We affirm.

## I. BACKGROUND

### A. FACTUAL HISTORY

Defendant owns a parcel of property in the city of Birmingham, Michigan at 118 Waterfall Lane (Lot 4). Contiguous to Lot 4 to the south is the Waterfall Hill Condominium (WHC), a six-unit condominium project located on Waterfall Court, a circular drive. Plaintiff is responsible for the administration of the WHC. To the south of the WHC is Maple Road, which connects with Waterfall Court. To the west of the WHC is Waterfall Lane, a gravel road which also connects to Maple Road, on which Lot 4 is addressed. At issue here are defendant's rights under a recorded easement provided to Lot 4 by plaintiff and the original developer of WHC and how to interpret those rights based on a 2005 recorded amendment to the easement.

Waterfall Hill, LLC (Waterfall Hill) was the owner and developer of the WHC, and Ronald Hughes was the managing member of Waterfall Hill and the plaintiff's initial president. On August 16, 2000, Waterfall Hill acquired an interest in Lot 4 with a purchase agreement and addendum from then-owner Daisy Scott. Waterfall Hill and plaintiff conveyed an easement to Scott (the Original Easement), which was recorded on April 27, 2004. The Original Easement granted Lot 4 certain rights to and over areas of the WHC property. On July 23, 2004, Waterfall Hill executed a quit claim deed, transferring its interest in Lot 4 to Hughes and his wife. Scott simultaneously provided the Hugheses with a warranty deed to Lot 4. The couple demolished the existing home and made plans to build their own home on it. Waterfall Hill also constructed a continuous brick privacy wall between Lot 4 and the WHC. Ronald Hughes did not procure a survey before the brick wall was installed as he owned both parcels. Until this litigation, he was unaware that the wall was on the WHC's property. Waterfall Hill also installed a 12-foot-wide brick paver stubbed driveway and erected the brick wall before any of the WHC units were sold. Directly north of the brick paver stubbed driveway were two breakaway columns in the brick wall that were intended to come down to create the exclusive driveway for Lot 4.

In January 2005, Dr. Stuart Stoller and his wife were the first to purchase a unit in the WHC. Around April 20, 2005, Waterfall Hill, LLC and plaintiff, Waterfall Hill Condominium Association, executed an amendment to the easement (2005 Amendment). Hughes signed the 2005 Amendment in his representative capacities as a member of Waterfall Hill, LLC and as the president of plaintiff association. Both Hugheses also signed the 2005 Amendment in their individual capacities as the "Grantee," being the current owners of Lot 4 and Scott's successors. The 2005 Amendment contained some provisions identical to those in the Original Easement, some altered, and some brand new to the amendment.

For a time, the Hugheses lived in the WHC's Unit 4. They sold their unit in 2010, when there were issues between Hughes and the other condo owners. At that point, Stoller was plaintiff's president. In April 2013, defendant, through its sole member, James Wiese, purchased Lot 4 from the Hugheses. An exhibit attached to the warranty deed executed reflected that Lot 4 was subject to the easement described in the 2005 Amendment, "which supersedes in its entirety" the Original Easement. There was also a "Private Road Acknowledgment" that likewise described the 2005 Amendment as superseding in its entirety the Original Easement.

When defendant purchased Lot 4, a patch of dirt still sat between the end of the brick paver driveway and the brick wall. Although the driveway could not be used, Lot 4 had access to Maple Drive from Waterfall Lane. Wiese had intended to close off Lot 4 from Waterfall Lane and for the driveway off Waterfall Court to be the only entrance to Lot 4. Wiese had also initially planned to install a mailbox on the Waterfall Court driveway despite his knowledge of the prohibition against tradespeople and trailers, including landscapers and repair persons, on the easement and that "by having that be the only entrance, it would by necessity mean that all of those people would have to transverse Waterfall Court."[1]

---

[1] A gate was subsequently placed on the western side of Lot 4 to provide ingress and egress to Waterfall Lane, where the mailbox was also installed.

In June 2016, defendant removed the "breakaway" portion of the brick wall to put in a driveway for the new home on Lot 4 and connect it to the brick paver driveway in the easement on the WHC's property because the city would not issue a certificate of occupancy until he did. Defendant's unilateral removal of the brick wall in front of the brick paver driveway instigated the instant dispute with plaintiff. The board reviewed the 2005 Easement and concluded that defendant was required to provide notice to it and obtain a certificate of occupancy first. The board also discovered defendant's plans to construct a mailbox, to install a gate with a keypad and other necessary equipment, and to put in brick pavers to widen the driveway from the original 12-foot width to the 16-foot-wide opening in the brick wall. Plaintiff disputed the construction of all of these items and ordered defendant to cease construction until it received approval. Defendant stopped construction, but maintained that it received approval to continue roughly a week later. Defendant then completed the driveway and gate installation. On August 2, 2016, defendant received the certificate of occupancy for the home on Lot 4.

## B. PROCEDURAL HISTORY

On January 26, 2017, plaintiff filed a complaint against defendant, alleging breach of the 2005 Amendment and multiple instances of trespass. It requested a declaratory judgment ordering defendant to pay 1/7th of the costs and expenses related to upkeep of Waterfall Court, services that render Waterfall Court passable, and all expenses related to use and upkeep of the water pump. Plaintiff also requested a declaratory judgment that the installation of the gate and keypad and possible installation of a mailbox anywhere on the WHC property exceeded the scope of the easement. Defendant answered and filed multiple counterclaims.

On September 1, 2017, defendant filed a motion for summary disposition. Plaintiff opposed the motion and asked the court to grant summary disposition in its favor. The trial court denied summary disposition on all issues except for plaintiff's stipulation that it was not affiliated with Lot 4 and plaintiff's argument that the 2005 Amendment governed the other questions.

A three-day bench trial followed. Multiple witnesses, including Hughes, Wiese, and Stoller, testified. On March 7, 2018, the trial court issued its opinion. The trial court determined that defendant breached the 2005 Amendment and trespassed by tearing down the breakaway portion of the brick wall without notice and a certificate of occupancy, even though it also found that the width of the breakaway section did not violate the 2005 Amendment. The trial court further determined that defendant breached the 2005 Amendment when it constructed the overage and flare and installed the pedestal/keypad, sign, gate, and gate equipment. The trial court concluded that defendant did not owe monthly dues to plaintiff, but the court did include a provision similar to an indemnification provision from the 2005 Amendment. It awarded nominal damages to plaintiff for defendant's trespasses and it ordered defendant to remove "at its entire and full expense" the overage, flare, sign, pedestal, gate, and gate equipment from plaintiff's property and to restore plaintiff's property to the condition it was in before defendant's trespasses.

The trial court subsequently denied defendant's requests for a stay and relief from judgment. This appeal followed. Defendant requested a stay pending the outcome of this appeal, which this Court granted.[2]

## II. STANDARDS OF REVIEW

"The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005). Likewise, whether a use or action exceeded the scope of an easement is also generally a question of fact that we review for clear error. *Wiggins v City of Burton*, 291 Mich App 532, 550; 805 NW2d 517 (2011). "However, when reasonable minds could not disagree concerning these issues, they should be decided by the court on summary disposition as a matter of law." *Id.* We review de novo a trial court's decision on a motion for summary disposition. *Blackhawk*, 473 Mich at 40. We also review a trial court's dispositional ruling on equitable matters de novo. *Id*.

Following a bench trial, we review the trial court's factual findings for clear error and review its conclusions of law de novo. *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004). Factual findings are clearly erroneous if we are left with the firm and definite conviction that a mistake had been made. *Reed v Reed*, 265 Mich App 131, 150; 693 NW2d 825 (2005). In addition, we review for an abuse of discretion the trial court's grant of injunctive relief. *Martin v Murray*, 309 Mich App 37, 45; 867 NW2d 444 (2015). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *Detroit Fire Fighters Ass'n IAFF Local 344 v City of Detroit*, 482 Mich 18, 28; 753 NW2d 579 (2008).

## III. ANALYSIS

We first address the merits of the trial court's summary disposition order and then its opinion after trial.

### A. SUMMARY DISPOSITION

Defendant argues that the trial court erred when it determined on summary disposition that this dispute was governed by the 2005 Amendment because it superseded the Original Easement. In reaching this conclusion, the trial court relied upon the 2013 warranty deed documents that twice expressly provided the 2005 Easement superseded the Original Easement. Defendant asserts the warranty deed documents cannot control because the grantors to the easements differ from the parties to the 2013 warranty deed, and, as a matter of law, "[w]here the rights to an easement are conveyed by grant, neither party can alter the easement without the other party's consent." *Blackhawk*, 473 Mich 46-47 (citations omitted). Although plaintiff disputes this, it offers an alternative ground for affirmance—review of the 2005 Amendment

---

[2] *Waterfall Hill Condo Ass'n v Great Lakes Custom Builder, LLC*, unpublished order of the Court of Appeals, entered June 20, 2018 (Docket No. 343673).

demonstrates that it supersedes the Original Easement. Because we agree that the trial court reached the correct result,[3] we affirm. *Adell Broadcasting v Apex Media Sales*, 269 Mich App 6, 12; 708 NW2d 778 (2005).

The trial court granted plaintiff partial summary disposition under MCR 2.116(C)(10). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999) (citations omitted). "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id*. Importantly, "this Court's review is limited to review of the evidence properly presented to the trial court." *Barnard Mfg Co v Gates Performance Engineering, Inc*, 285 Mich App 362, 380; 775 NW2d 618 (2009).

Resolution of this issue also requires us to interpret the 2005 Amendment to the easement.

> The language of an express easement is interpreted according to rules similar to those used for the interpretation of contracts. Accordingly, in ascertaining the scope and extent of an easement, it is necessary to determine the true intent of the parties at the time the easement was created. Courts should begin by examining the plain language of the easement, itself. If the language of the easement is clear, it is to be enforced as written and no further inquiry is permitted. [*Wiggins*, 291 Mich App at 551 (quotation marks and citations omitted).]

Courts may not write a different contract under the guise of interpretation or consider extrinsic evidence to determine the parties' intent when definite and unambiguous contract language exists. *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 491; 579 NW2d 411 (1998).

Defendant has conceded that the 2005 Amendment complied with paragraph 8 of the Original Easement, which set forth how the parties could modify the easement. Thus, the parties agree that the 2005 Amendment amended the Original Easement, but disagree on its effect. Defendant argues that the provisions in the 2005 Amendment should be read in conjunction with the provisions of the Original Easement. Plaintiff argues that the 2005 Amendment completely superseded, or overwrote, the provisions of the Original Easement.

---

[3] In denying defendant's motion for relief from judgment after the bench trial, the court adopted the rationale set forth in plaintiff's response. Therein, plaintiff reiterated its position that the 2005 Amendment superseded the Original Easement and suggested that the trial court relied upon the undisputed evidence that Ronald Hughes and Wiese executed the documents recognizing that the 2005 Amendment superseded the Original Easement, rather than the warranty deed.

The parties disagree on how to determine the parties' intentions when they have executed two documents, the second of which covers some or all of the same elements as the first. Where parties "expressly modify their previous contract, rescission of the terms of the prior agreement is a necessary implication." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 373; 666 NW2d 251 (2003). Thus, "contradictory provisions in the prior agreement are *waived*." *Id*. On the other hand, if a writing references a separate instrument for additional contract terms, the two writings are read together. *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998).

Comparing the terms addressed and language used in the Original Easement and the 2005 Amendment, the 2005 Amendment superseded the Original Easement in its entirety. The 2005 Amendment is titled "Amendment of Easement" and makes several references to the Original Easement in the introductory and background paragraphs. Although it does not expressly incorporate the Original Easement, paragraph F explicitly states, "The Grantor desires to amend the Grant of Easement and Grantee desires to accept the Amendment as set forth herein."

Defendant is accurate insofar as it argues that the 2005 Amendment was clearly intended to amend, not terminate, the Original Easement, but defendant misunderstands the relationship between "termination" and "supersession." "Supersede" means "[t]o annul, make void, or repeal *by taking the place of*." *Black's Law Dictionary* (11th ed) (emphasis added). "Terminate," however, means "[t]o put an end to; to bring to an end." *Id*. Thus, termination is merely part of, and not coequal with, supersession. In order to supersede something, first the original must be voided or annulled, which is to say terminated, but additional action is required; something must be put in place of the original. In this way, supersession is an amendatory act. "Amend" means "[t]o change the wording of; specif., to formally alter (a statute, constitution, motion, etc.) by striking out, inserting, or substituting words." *Id*. In this case, the drafters amended the Original Easement by adding and deleting provisions and modifying the wording to the point that all of the provisions were either explicitly restated within the 2005 Amendment or superseded by its newly modified terms.

Both the Original Easement and the 2005 Amendment begin with a prefatory paragraph describing and defining the parties to the document. This introductory material is essentially identical with the exception of the respective parties' names. The same is true of the background paragraphs with the 2005 Amendment adding paragraph F, which reads: "The Grantor desires to amend the Grant of Easement and Grantee desires to accept the Amendment as set forth herein." Both the Original Easement and the 2005 Amendment next contain a section captioned "GRANT OF EASEMENT." Paragraph 1 of both documents grants a perpetual easement for five purposes, but the 2005 Amendment recognizes additional limitations related to a now-in-existence driveway. Paragraph 2 of 2005 Amendment alters the Original Easement's provision regarding the lack of limitation on pedestrian or vehicle access. Paragraph 2 of the 2005 Amendment explicitly limits the easement "to standard vehicular and pedestrian traffic." Importantly, previously allowed travel by contractors and tradesmen providing services or materials to Lot 4 is no longer permitted under paragraph 2 of the 2005 Amendment. Paragraph 3 in the Original Easement, which permits the recording of an amendment "[o]nce the driveway is installed," is omitted from the 2005 Amendment. Paragraph 3 of the 2005 Amendment incorporates paragraph 4 of the Original Easement, omitting the word "reasonably" and adding a clause. Paragraph 4 of the 2005 Amendment incorporates Paragraph 5 of the Original Easement, adding language to impose the associated expenses on the grantee. Paragraph 6 of the 2005

Amendment and paragraph 7 of the Original Easement discuss the allocation of costs to the grantee with respect to maintenance of the driveway and discuss different upkeep costs. In the Original Easement, paragraph 7 places the obligation to maintain the driveway "when constructed" on the grantee, who "otherwise bear[s] no expenses and pay[s] no charges or fees for the use of the easements. But, if a pump for the irrigation system drawing water from Quarton Lake needs to be replaced, Grantee shall pay 1/7th of the replacements costs and installation costs of a new pump." Paragraph 6 of the 2005 Amendment places the responsibility of maintaining, replacing, and repairing on the grantee. In addition, "the Grantee agrees to defend, reimburse, indemnify, and hold the Association harmless for any and all cost, expense, and damage incurred by the Association as a result of the usage of th[e] Easement by Grantee and Grantee's visitors, invitees, or guests or anyone else." Paragraphs 8 and 10 are identical. Paragraph 9 of the 2005 Amendment alters the language of paragraph 9 in the Original Easement regarding the termination process. Lastly, the 2005 Amendment includes the entirely new paragraph 7, entitled "Removal of the Wall."

Review of the 2005 Amendment demonstrates that every aspect of the Original Easement was expressly repeated, modified, or omitted. *Wiggins*, 291 Mich App at 551. Nothing in the language of the 2005 Amendment suggests that it is intended to be read in conjunction with the Original Easement. Instead, the 2005 Amendment is complete unto itself and intended to overwrite, or supersede, the Original Easement, as demonstrated by paragraph F. Defendant is correct only insofar as the trial court's determination that the 2005 Amendment superseded the Original Easement meant that the Original Easement was terminated as the authoritative document. However, because the 2005 Amendment replaced the Original Easement, the easement itself was not terminated. Rather, its terms were modified, i.e., amended, by the addition, deletion, and alteration of language to the new provisions found in the 2005 Amendment. Therefore, it is irrelevant that the 2005 Amendment did not follow the Original Easement's paragraph 9 termination requirements. Instead, the supersession of the Original Easement by the 2005 Amendment was an amendatory act done in compliance with paragraph 8 of the Original Easement.

Accordingly, regardless of whether the trial court improperly relied on the language of the 2013 warranty deed, the 2005 Amendment restated and altered the Original Easement to such an extent that the 2005 Amendment superseded the Original Easement. *Adell Broadcasting*, 269 Mich App at 12; *Hess v Cannon Twp*, 265 Mich App 582, 596; 696 NW2d 742 (2005) ("A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." (quotation marks omitted).[4]

---

[4] There being no error, we decline to address defendant's assertions about the ramifications of this determination. Additionally, defendant contends that, because the trial court erred in its determination that the 2005 Amendment superseded the Original Easement, it erred by holding that defendant had any financial obligations to plaintiff outside of the maintenance and upkeep of the driveway and 1/7th of the cost of upkeep and maintenance of the water pump. Because we have determined that the trial court properly determined that the 2005 Amendment superseded the Original Easement, we reject defendant's argument premised on a paragraph from the

## B. TRESPASSES

Defendant also argues that the trial court erred in: (1) its determination that the flare and overage constituted a trespass, including its decision that the gate and related equipment were not necessary for enjoyment of the easement and (2) its order to remove the overage and flare and move the gate and related equipment. We conclude that the trial court did not err.

### 1. REPAIRS OR IMPROVEMENTS INCIDENTAL TO THE EASEMENT

Defendant argues that the trial court erred by concluding that its installation of the overage, flare, keypad, and gate with related equipment constituted a trespass rather than repairs or improvements to the easement that did not unreasonably interfere with plaintiff's use of the property.

"The use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957). An easement holder "cannot 'make improvements to the servient estate if such improvements are unnecessary for the effective use of the easement or they unreasonably burden the servient tenement.' " *Blackhawk*, 473 Mich at 41, quoting *Little v Kin*, 468 Mich 699, 701; 664 NW2d 749 (2003), citing *Crew's Die Casting Corp v Davidow*, 369 Mich 541; 120 NW2d 238 (1963); *Unverzagt v Miller*, 306 Mich 260, 265; 10 NW2d 849 (1943); *Mumrow v Riddle*, 67 Mich App 693, 700; 242 NW2d 489 (1976). If the first question is answered negatively, "the need to answer the second question is obviated[.]" *Id*. at 42.

Here, the trial court specifically found that the easement was designed to accommodate standard vehicular pedestrian traffic and that "[v]ehicular traffic can easily (actually more easily) ingress and egress on the Driveway without the installation of the Pedestal, the Gate, and the Gate Equipment." Because defendant's improvement was unnecessary, the trial court did not address whether it was unreasonably burdensome. The court's findings are not clearly erroneous.

Defendant's initial argument is premised on its assertion that "the flare and overage [we]re not a trespass because they [we]re within the scope of the Original Easement, as confirmed by Hughes' testimony." Again, based on the plain language of the 2005 Amendment, the trial court properly decided that the improvable portion of the easement was limited to the width of the driveway as it existed at that point in time. Therefore, defendant's premise that the flare and overage did not constitute a trespass is without merit.

In any event, Stoller testified that the flare was unnecessary, noting cars still fit without the flare, and that it was just "decoration" placed on plaintiff's property. Accordingly, evidence

---

Original Easement. We also reject defendant's other arguments premised on the Original Easement.

in the record supported the trial court's determination that the flare and overage were not necessary to defendant's use of the easement.[5]

Defendant further argues that the gate and its related equipment are necessary for the enjoyment of the easement because the gate prevents delivery vehicles, trucks, and other prohibited traffic from using Waterfall Court to access Lot 4 as required by the 2005 Amendment. There is no question that defendant has the obligation to prevent contractors, tradespeople, and maintenance and supply vehicles, among others, from attempting to access Lot 4 through Waterfall Court. Indeed, there is some record evidence suggesting that the construction of the gate was to address complaints from plaintiff about such violations. But the record also reflects that the gate defendant erected on the driveway is not a mechanism that will fulfill this obligation. To the contrary, the gate increases defendant's violations of the easement. And in focusing on the impermissible vehicles' ability to actually reach Lot 4 from the driveway, defendant fails to recognize that the vehicles have *already* violated the terms of the easement by using Waterfall Court to reach the driveway in the first place.

Subsections (ii) and (iii) of paragraph 1 of the 2005 Amendment, respectively, provide for a perpetual easement for "standard vehicular and pedestrian ingress and egress" and "vehicular parking on the paved surfaces of the Condominium Project intended for vehicle traffic or parking." Neither of these easement rights is limited to the area of the driveway between Waterfall Court and Lot 4, but necessarily encompasses use of Waterfall Court itself. Indeed, easement rights to the driveway would have no meaning without an attendant right to use Waterfall Court to reach or leave it.

The easements and rights granted in paragraph 1 are expressly limited and clarified by paragraph 2. Paragraph 2 begins: "The Easement shall be limited to standard vehicular and pedestrian traffic." The remainder of paragraph 2 is best understood as a preventative clarification addressing arguments that could arise over what constitutes "standard" vehicular and pedestrian traffic. The first clarification addresses what is arguably an overburdening of that easement that would occur if the owner of Lot 4 held a party. Because parties are not necessarily commonly held events, arguably the increased vehicular and pedestrian traffic and parking created by a party does not fall within "standard vehicular and pedestrian traffic"; and therefore, is not covered by the easement. Apparently anticipating the possibility of such an argument, paragraph 2 provides:

---

[5] After oral argument, defendant filed supplemental authority, citing to *Maniaci v Diroff*, __ Mich __ ; __ NW2d __ (Docket No. 158005, rel'd November 21, 2019). The easement at issue in *Maniaci* allowed the plaintiff to launch watercraft, including by boat trailer. The Supreme Court had no difficulty in concluding that the easement provided an express right to back a boat trailer to the water's edge. Moreover, regrading the easement was necessary to its reasonable and proper enjoyment because opposing counsel conceded that no boat could be launched from a boat trailer given the property's current slope. Based on Stoller's testimony, *Maniaci* is easily distinguishable because there is no need for the overage or flare in order for defendant to enjoy its easement.

The parking and access easements are specifically intended to include and allow access for passenger vehicles and pedestrians to Lot 4, the occasional and temporary parking of vehicles and the occasional and temporary use of valet services for parking such vehicles at such occasions as the Grantee may require and to allow access over the driveway between Units 4 and 5. Other than for regular access over the driveway by pedestrians and vehicles, it is expected such other uses will be only occasional and temporary. The vehicular access, parking, and other access rights shall also extend to use by any visitors, invitees, and guests of the Grantee.

Thus, the owner of Lot 4 is explicitly permitted to use Waterfall Court and the driveway from it for the multitude of parked cars, taxis and other passenger vehicle drop-offs, and guests, along with valet parking, all of which would occur from the occasional party. The language also makes clear that such uses are intended to be "occasional and temporary" which would preclude Lot 4 from overburdening the easement by becoming a party venue.

The second possible type of vehicular and pedestrian traffic that could be considered "standard" is the temporary parking of repair persons, trade vehicles, trailers, and other large, possibly unsightly, vehicles. Similar, in the sense of both questionable aesthetic nature and potential to be considered vehicular use, is the storage of boats, trailers, snowmobiles, four-wheelers, and other "recreational toys," which are often parked on driveways to leave space for roadway passenger vehicles in garages. Paragraph 2 of the 2005 Amendment made clear that to the extent that such uses might be considered standard, they are explicitly prohibited. By prohibiting moving vans, delivery trucks, lawn maintenance vehicles, and these other types of vehicles, plaintiff not only kept the vehicles out of their line of sight, but also prevents these generally heavier vehicles from breaking down the condition of Waterfall Court faster than would occur if the road was just exposed to additional standard passenger vehicles. It is this portion of the easement that defendant has overlooked and that the gate overburdens.

Defendant is correct that removal of the gate will likely allow prohibited vehicles to access Lot 4 through the driveway from Waterfall Court in violation of the easement. However, violations of the easement have already occurred by the time a prohibited vehicle reaches the driveway because the breach occurs when the vehicle enters Waterfall Court instead of Waterfall Lane. Indeed, Wiese admitted as much at trial, conceding that the easement prohibited him "from having tradesmen, deliverers, any kind of commercial vehicle come onto Waterfall Court" and that "[t]he gate does not prohibit them from coming onto Waterfall Court." Moreover, prohibited vehicles discovering the gate on the driveway then *remain* on plaintiff's property for longer periods of time while they attempt to get through the gate, park on Waterfall Court, or otherwise attempt to determine another way to access Lot 4. Wiese testified, "They may [come onto Waterfall Court], and then if they—when they find out they can't enter it, they're going to have to leave, and enter through Waterfall Lane." Stoller testified that, with the gate in place, tradespeople and commercial trucks still attempted to access Lot 4 using Waterfall Court and that although some were turned away, others "went through" because plaintiff could not police it constantly. Thus, the gate does not prevent prohibited vehicles from entering onto plaintiff's property. Instead, the gate increases the duration of the breach and burden on the easement by extending the time the prohibited vehicles spend on plaintiff's property. Furthermore, a reasonable inference from this testimony is that removal would *reduce* the burden created by the

breaches because the vehicles could move off plaintiff's property onto defendant's property, where the vehicle would no longer be committing a trespass.

For these reasons, the trial court did not clearly err when it determined that vehicular traffic could move more easily without the pedestal, gate, and gate equipment and that the gate was not necessary for defendant's enjoyment of the easement.[6]

## 2. COST TO REMOVE GATE

Finally, defendant asserts that the trial court abused its discretion by ordering defendant to relocate the gate and its related equipment because its encroachment was *de minimis* and greatly outweighed by the expense it would incur in moving the gate. We disagree.

First, the trial court did not order defendant to *relocate* the gate and its related equipment. It ordered its *removal*. Defendant may, on its own, determine whether it desires to incur the cost to reinstall the gate at a different location that does not create a trespass. This Court can only consider the cost of what the trial court actually ordered defendant to do.

Second, there is no evidence in the trial court record regarding the cost to remove, let alone relocate, the gate. Defendant relies on an affidavit from Wiese that was executed in June 2018, after had trial ended. Although this Court properly considered the affidavit in its determination to grant a stay, when evaluating the propriety of the trial court's removal order, our "review is limited to the record presented in the trial court or administrative tribunal." *Amorello v Monsanto Corp*, 186 Mich App 324, 330; 463 NW2d 487 (1990).

Defendant's assertion that the cost of the removal or relocation of the gate was not relevant until the trial court actually ordered it is without merit. Plaintiff's requested relief included a request that the trial court order defendant to remove the gate, keypad, and all of their component parts from plaintiff's property and to restore the property to its condition before defendant's breaches. In fact, during trial, Wiese admitted that he had received correspondence on July 20, 2016, stating that plaintiff had never agreed to the location of the keypad, it was causing a big problem for Waterfall Hill, and Wiese should plan to remove it. Thus, when trial took place in early 2018, whether defendant should have to remove the gate from plaintiff's property was at issue and its opportunity to present evidence and argument regarding the cost-prohibitive nature of the removal was then.

Finally, defendant's assertion that its trespasses are *de minimis* is wholly unfounded. Defendant's actions show the intent to take possession and ownership of the land. Notably, none of the trespasses is on the land subject to the easement. The overage and the flare fall outside the driveway area as does the land to the north of the brick wall and the land on which the keypad was installed. Plaintiff is precluded from making use of the land underneath or the space above the pavers in the overage and flare. Any planting would disrupt the pavers and any items placed on the pavers would interfere with defendant's use of the driveway, potentially blocking access

---

[6] Consequently, defendant's reliance on *Maniaci*, __ Mich __, is misplaced. See footnote 5.

to the keypad or the electronic eyes. In fact, Stoller testified that defendant's installation of the gate in conjunction with the bushes Hughes had already caused landscapers and repair people to have to cross the driveway and go through the courtyard area of condominium unit five in order to access the property, air conditioners, and other common elements located behind units five and six. Previously, they would walk to the east end of the brick wall, go around to the north side of the wall, and walk along the property line to access irrigation equipment and other items necessary for caring for plaintiff's property as well the property north of the wall. When defendant's counsel asked why plaintiff needed the area north of the wall, given it was roughly a foot-wide and tapered down to a small patch, questioning what purpose plaintiff was denied that the land served, Stoller responded, "It's our property . . . . It doesn't have to have a purpose." Defendant's counsel suggested that plaintiff ought to have amended the master deed or other documents so that the boundary of plaintiff's property was moved to the brick wall. Stoller questioned why plaintiff would want to, and defendant's counsel asserted that it "avoid[ed] problems that we have here right now." Stoller noted that there would not have been any problems if defendant had abided by his property line and that just because an area is grass and not being actively used does not give a neighbor the right to put something on that land. Defendant's counsel asked if the offensive nature of the trespass was that the gate traversed along plaintiff's property. Stoller responded, "It's all of the above. It's that. It is the arrogance that someone can come and just do what they want whenever they want, and everything's fine until they get caught; that's . . . that's the whole point." Stoller then added, "if the person buying a property needs extra room, then they come and ask how do we settle this, can we rent it from you, . . . can we change the easement, can I buy this portion. That was never done." Stoller noted that defendant likely did not want its expensive new home to have to be accessed from a dirt road (Waterfall Lane) if they could use a well-maintained, paved road with expensive condos, landscaping, and lighting (Waterfall Court).

Defendant has consistently argued that because there was no useful purpose for which plaintiff could put that minimal amount of land on the north side of the brick wall, plaintiff ought to have ceded ownership of it to Lot 4 and avoided this whole problem. But, as Stoller noted, plaintiff did not have to have a use for the land; WHC owned it and plaintiff was entitled to stop defendant from putting anything on that land plaintiff did not want. Defendant had had multiple options through which to seek permission to use or ownership of the disputed area. Instead, defendant took unilateral action that it knew exceeded its ownership and easement rights in an effort to exercise dominion over plaintiff's property. And, given Wiese's admission that he was going to close off Lot 4 from Waterfall Lane and make Waterfall Court the only entrance to Lot 4, defendant's breaches were intentional. Under these circumstances, defendant's actions were not a minimal burden on plaintiff's land that plaintiff could otherwise use. Instead, defendant's attempted taking displaced plaintiff from its land and prevented any alternative use. Because there was no other way for the trial court to give back to plaintiff its ownership, control, and possession of the land that defendant usurped by installing the overage, flare, gate, keypad, and related equipment, the trial court did not abuse its discretion in ordering defendant to remove those items.

## IV. CONCLUSION

The trial court properly determined that the 2005 Amendment superseded the Original Easement. The trial court did not err by finding that the defendant had trespassed and that the gate and its related equipment were not necessary for defendant's use and enjoyment of the easement. The trial court did not abuse its discretion in ordering defendant to remove the gate and its related equipment.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark T. Boonstra
/s/ Anica Letica