*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH NORTON and CAMILLE NORTON,

   Plaintiffs/Counterdefendants-
   Appellees,

v

GREGORY BISCHER and ILENE BISCHER, Co-
Trustees of the BISCHER REVOCABLE FAMILY
TRUST,

   Defendants-Appellees,

and

KAREN TRELFA and KENNETH TRELFA,

   Defendants/Counterplaintiffs/Third-
   Party Plaintiffs-Appellants,

and

FRANCIS T. MCGEORGE and SARA M.
MCGEORGE,

   Third-Party Defendants-Appellees.

UNPUBLISHED
November 17, 2025
12:12 PM

No. 369409
St Clair Circuit Court
LC No. 20-001799-CZ

JOSEPH NORTON and CAMILLE NORTON,

   Plaintiffs/Counterdefendants-
   Appellees,

v

GREGORY BISCHER and ILENE BISCHER, Co-
Trustees of the BISCHER REVOCABLE FAMILY
TRUST,

No. 369453
St Clair Circuit Court
LC No. LC No.20-001799-CZ

-1-

Defendants-Appellants,

and

KAREN TRELFA and KENNETH TRELFA,

Defendants/Counterplaintiffs/Third-
Party Plaintiffs,

and

FRANCIS T. MCGEORGE and SARA M.
MCGEORGE,

Third-Party Defendants-Appellees.

---

Before: REDFORD, P.J., and FEENEY and BAZZI, JJ.

PER CURIAM.

This consolidated appeal[1] arises from a trespass and conversion action between landowners of properties on Harsens Island that front onto the St. Clair River. Although the same parties participate in both dockets, and arise from the same bench trial and trial court order, Karen Trelfa and Kenneth Trelfa are the appellants in Docket No. 369409, and Gregory Bischer and Ilene Bischer, as co-trustees of the Bischer Revocable Family Trust, are the appellants in Docket No. 369453. Furthermore, Camille Norton, Joseph Norton, Francis T. McGeorge, and Sara M. McGeorge are appellees in both dockets.

In Docket No. 369409, the Trelfas appeal as of right the trial court's final judgment, arguing that the trial court erred by: (1) finding them liable for common law and intentional trespass; (2) finding them liable for statutory conversion; (3) finding their third-party claims against the McGeorges to be frivolous; and (4) granting a permanent injunction. In Docket No. 369453, the Bischers also appeal as of right the trial court's final judgment, arguing that the trial court erred by: (1) ruling that the Nortons, opposed to the Bischers, had a superior property interest in the contested pie-shaped parcel; (2) finding them liable for common law and intentional trespass; (3) granting a permanent injunction, and (4) awarding attorney fees as exemplary damages. We affirm.

I. FACTS

---

[1] *Norton v Bischer Revocable Family Trust*, unpublished order of the Court of Appeals, entered January 31, 2024 (Docket Nos. 369409; 369453).

This case involves the manipulation of a natural swale that meandered through the Norton's and the Bischer's properties.[2] The swale was originally about 1.7 to 3.6 inches deep, and it had historically provided proper drainage for both lots. This case also involved a dispute about who owned a relatively small, pie-shaped parcel of land where the swale approached the river: the Nortons or the Bischers.

In 2018, with permission from the owner of the now-Bischer lot, Kenneth Trelfa began to shovel out the culvert to alleviate flooding at nearby properties, including his own. In fall 2018, after the Bischer's purchased their property, Gregory Bischer gave Kenneth permission to clear out the swale and extend it into the culvert. Despite never directly obtaining the Norton's permission to work on the swale and culvert, Kenneth: (1) shoveled out the swale and culvert, (2) drove heavy equipment onto the Norton's property, (3) removed fallen trees, (4) excavated the swale, (5) put in a 30-foot culvert extension with a flap gate to the river, (6) plugged the culvert inlet, (7) raised the elevation of the Norton's property surrounding the swale by about eight inches, (8) pumped water from his lot and the Bischer's back lot into the swale, and (9) removed soil from the Bischer's and the Norton's properties.

Between the winter of 2018 and the spring of 2019, the Nortons learned of Kenneth's actions. When Kenneth learned of the Norton's objections, he stopped his work. At some point, the Nortons asked the Bischers to "put the swale back in," but the Bischers indicated that they had no intentions of asking Kenneth to stop his work because they believed that the property was theirs, and they were glad that his work was draining their back lot. The Trelfas and the Bischers were asked to cease and desist their efforts multiple times by way of the township, the Norton's counsel, and the Nortons themselves.

In November 2019, Joseph Norton had a conversation with Michael Badalamente, who was the construction worker currently hired by the Bischers to build their house and who had previously been employed by the Nortons on other properties. Joseph told Badalamente that he wanted the swale "filled back in," which Badalamente understood meant that he wanted the swale restored to its original condition. Thereafter, the Norton's counsel sent the Bischer's counsel two e-mails indicating that if Badalamente restored the swale to its original condition, the Nortons would consider this matter resolved; the Norton's counsel never received a response.

In May 2020, Joseph learned that Badalamente wanted to bury a pipe in the old swale area. Badalamente testified that he understood that the Nortons "adamantly did not want the pipe," and he agreed to stay off their property. Thereafter, Badalamente asked the Bischers if they would be okay with the pipe being on their property. After they agreed, he hired a survey company to stake out the property, and a subcontractor to: (1) bury a 30-foot pipe where the swale used to be, and (2) install a catch basin at the culvert inlet. At some point, the Bischers also raised a portion of their parcel about three to four feet, so it now grades down toward the Norton's property on the

_____

[2] The Norton's purchased their vacant property in 2000, and they planned to eventually build a retirement home on it. The Bischers purchased their property in 2018, constructed a house on the property throughout 2019 and 2020, and eventually resided on the property in 2021.

south side, creating an accumulation of surface water that must be pumped out. These intrusions have resulted in the loss of the swale and the accumulation of water on the Norton's property.

In October 2020, the Nortons filed a complaint against the Bischers and the Trelfas, requesting a preliminary permanent injunction and alleging trespass, intentional trespass, and statutory conversion. The Trelfas proceeded to file a third-party complaint against the McGeorges, requesting declaratory relief and alleging fraudulent or negligent misrepresentation and common law indemnity on the basis that the McGeorges, acting as the Norton's agents, approved the work that Trelfa performed. After a four-day bench trial, the trial court determined that Trelfa's third-party defense was frivolous. The trial court ruled in favor of the Nortons and against the: (1) Bischers and Trelfas for common law and intentional trespass, (2) Bischers and Trelfas for a detailed permanent injunction, and (3) Trelfas for statutory conversion. The trial court also awarded the Nortons their damages, costs, and attorney fees.

## II. PRESERVATION AND STANDARDS OF REVIEW

Because the parties raised their appellate issues before the trial court, they are preserved for our review. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008).

"A trial court's findings of fact in a bench trial are reviewed for clear error while its conclusions of law are reviewed de novo." *Midwest Valve & Fitting Co v Detroit*, 347 Mich App 237, 250; 14 NW3d 826 (2023), aff'd 14 NW3d 393 (Mich, 2024). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id*. (quotation marks and citation omitted). "This Court is especially deferential to the trial court's superior ability to judge of the relative credibility of witnesses." *Fraser Twp v Haney*, ___ Mich App ___, ___; ___NW3d ___ (2025) (Docket No. 368834); slip op at 2 (quotation marks and citation omitted). "Although equity cases are themselves reviewed de novo, as are the applicability and interpretation of equitable doctrines, the propriety of the actual relief granted by the trial court is strictly discretionary and depends on the facts of the particular case." *Id*. (quotation marks and citation omitted). "A trial court abuses its discretion when it chooses an outcome falling outside the range of principled outcomes. A trial court necessarily abuses its discretion when it makes an error of law." *Id*. (quotation marks and citations omitted).

"A trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo." *Shivers v Covenant Healthcare Sys*, 339 Mich App 369, 373; 983 NW2d 427 (2021). "A trial court's determination that an action is frivolous is reviewed for clear error." *Bradley v Frye-Chaiken*, 514 Mich 679, 705; 22 NW3d 458 (2024) (quotation marks and citation omitted).

## III. SUPERIOR PROPERTY INTEREST—PIE-SHAPED PARCEL

On appeal, the appellants first argue that the trial court erred by determining that the Nortons had a superior property interest—compared to the Bischers—in the disputed pie-shaped parcel. We disagree.

### A. UNDERLYING ARGUMENTS AND MISSTATEMENTS

Before we can substantively analyze this argument, we must first address several underlying arguments and misstatements.

### 1. ADMISSION OF ANTHONY SYCKO'S TESTIMONY

The Bischers first argument concerns Anthony Sycko, who testified as an expert in land surveying for the Nortons. The Bischers argue that the trial court abused its discretion by admitting Sycko's testimony regarding the property line because at his deposition, Sycko stated that he did not have an opinion concerning the issue. This argument misstates Sycko's testimony and lacks merit.

On the date of his deposition, Sycko had already completed his survey, which depicted the property line in favor of the Nortons. Therefore, Sycko clearly had an opinion on the issue. The Bischer's argument refers to the fact that at his deposition, Sycko was presented with previous surveys that conflicted with his property-line determination, and he indicated that he did not have an opinion on the conflicting surveys because he had not done any research or investigation into them. Sycko later reviewed those surveys and determined that they did not change his opinion on the matter. Accordingly, the trial court allowed Sycko's testimony, finding that it was consistent with his previously disclosed survey.

We conclude that because Sycko's testimony and opinion at trial matched his previously disclosed survey and opinion concerning the property line, the trial court did not abuse its discretion by allowing Sycko's testimony. See *Fraser Twp*, ___ Mich App at ___; slip op at 2.

### 2. MISSTATEMENT OF ANTHONY SYCKO'S SURVEY METHOD

The Bischer's further misstate Sycko's testimony and create a red herring concerning the thread of the St. Clair River. The Bischers argue that "Sycko admitted that the general rule of surveying is to draw the boundary line from the center of vacated Althea [Avenue][3] perpendicular to the *thread of the river*," but that "he attempted to explain his survey by saying that it would be difficult to determine the thread of the St. Clair River." The Bischers go on to say that Sycko's testimony was disputed by their expert witness who testified that "there are navigational charts galore showing the thread of the St. Clair River." But, at no point, did Sycko say that the general surveying rule was not manageable because of the thread of the river.

Instead, Sycko explained that the general rule was not manageable in this case because the vacated Circuit Street—which ran parallel to the river's edge and intersected with the vacated Althea Avenue—had meandering borders varying in width. Accordingly, a perpendicular measurement from that street would be ambiguous. Conversely, Sycko explained that because the vacated Althea Avenue had a defined width, the continuation of the Althea Avenue arc would not be ambiguous. Sycko testified that it was proper to rely on the "best available evidence" of the

---

[3] There were two vacated roads of importance in this case: (1) Althea Avenue ran in an arc between the Norton's and the Bischer's property line—near the swale—and intersected with (2) Circuit Street, which ran parallel to the St. Clair river, along the parties' shorelines.

known facts; therefore, he determined that the proper boundary line followed the Althea Avenue arc, which supported the notion that the Nortons owned the disputed pie-shaped parcel. Sycko acknowledged that there were surveys that disagreed with his boundary line, but he stated that they did not change his opinion because it was unclear what those surveys drew the boundary line perpendicular to, i.e. the seawall, the shoreline, or the pavement.

Accordingly, Sycko's testimony was not reliant, in any way, on the thread of the St. Clair river.

### 3. RED HERRING CONCERNING NEARBY PROPERTIES

The Bischer's offer further red-herring arguments by drawing attention to their expert witness's brief testimony that two nearby lots previously drew a boundary line perpendicular to the water. We believe the trial court found this information unpersuasive because: (1) there is no indication of whether the property owners simply agreed to that boundary line or a court determined it; (2) there was no information presented regarding whether the vacated road in that instance had meandering boundaries like the vacated road in this case; and (3) the referenced boundary line does not even appear to be drawn from the center of the vacated road, in accordance with the "general rule."

### 4. ADMISSION OF ALLEGED AGREEMENT

The Bischers also argue that the Norton's evidence of acquiescence—namely Joseph's testimony regarding an alleged agreement with Milton Osgood Sr., the previous owner of the now-Bischer lot—was grounded in inadmissible hearsay.[4] But the trial court properly ruled that the statements were not hearsay because they were not being offered for the truth of the matter, explaining that "to the extent that they had conversations and based upon that conversation, he acted or reacted in a certain way that is a non hearsay purpose. I will allow it for those reasons." See *People v Gaines*, 306 Mich App 289, 306-307; 856 NW2d 222 (2014) (quotation marks, citations, and alterations omitted) ("An out-of-court statement introduced to show its effect on a listener, as opposed to proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c). Such statements are not offered for a hearsay purpose because their value does not depend upon the truth of the statements."). Nonetheless, the Bischer's argue that the trial court erroneously treated this testimony for the truth of the matter by acknowledging it in the court's opinion and order. But, for the reasons discussed next, although the trial court mentioned Joseph's testimony in its opinion and order, it did not simply accept Joseph's testimony for the truth of the matter asserted; instead, when making its decision, the trial court relied on ample evidence supporting the party's treatment of the boundary line.

### B. SUBSTANTIVE ANALYSIS

---

[4] Even though the Bischer's acknowledge that the trial court admitted these statements for non-hearsay purposes, the Bischers distractingly discuss the trial court's brief mention of MRE 803(20) (a hearsay exception regarding boundary lines). We decline to address this red herring.

In this case, the trial court determined that from 2001 to 2018, the Osgoods acquiesced to the Althea Avenue property line. We agree.

"Under Michigan law, parties may acquiesce to a new property boundary line." *Houston v Minto Group, LLC*, 335 Mich App 545, 567; 968 NW2d 9 (2021). "[A]cquiescence is established when a preponderance of the evidence establishes that the parties treated a particular boundary line as the property line." *Id*. (quotation marks and citation omitted; alteration in original). "The doctrine of acquiescence provides that where adjoining property owners acquiesce to a boundary line for at least fifteen years, that line becomes the actual boundary line." *Killips v Mannisto*, 244 Mich App 256, 260; 624 NW2d 224 (2001).

In 2000, a survey was performed, indicating that the Norton's property line continued along the arc of the vacated Althea Avenue, which supported the notion that the Nortons owned the disputed pie-shaped parcel. In 2001, that survey was revised, concluding that the Norton's property line actually ran perpendicular to the water from the vacated Althea Avenue, which supported the notion that the Bischer's owned the disputed pie-shaped parcel. Joseph testified that soon after those surveys were performed, he talked to Milton Sr. about connecting their neighboring seawalls over the disputed property, but Milton Sr. was opposed to the idea because he believed that it would prevent both properties from draining. Joseph denied that Milton Sr.'s original opposition had anything to do with property ownership; however, a time eventually came when Milton Sr. claimed ownership over the disputed pie-shaped property. Joseph testified that when that time came, he presented Milton Sr. with: (1) the original 2000 survey, and (2) a letter from the woman he bought his property from, stating that the property "had been in [her] family for decades" and had since been deeded to the Nortons. At that point, Joseph stated that he and Milton Sr. "reached kind of an agreement that we were not going to build our seawall across there." Milton Sr. later told Joseph that he had seen the revised 2001 survey. Nevertheless, Joseph testified that Milton Sr. agreed with Joseph's property-line position, and Joseph agreed to honor Milton Sr.'s knowledge about the drainage and not extend his seawall. Accordingly, when Milton Sr. and Joseph later repaired their seawalls, they did not extend them in that direction.

In 2002, Joseph submitted a proposal to the State of Michigan to extend his seawall 15 feet into the river. That proposal depicted the alleged agreed-upon property line, and Milton Sr. never filed an objection with the state. Notably, even though Milton Sr. had been involved in, and ultimately won, a lawsuit regarding a different boundary line, Milton Sr. never initiated a lawsuit regarding this property line. Milton Sr.'s daughter-in-law, Peggy Osgood, also testified that in 2002, the Nortons extended their dock—despite the fact that Milton Sr. believed that it would encroach on his property—because the Nortons had "won" the dispute. In August 2003, Peggy's husband hired counsel and had them write a letter to the Nortons, stating that the Nortons should not erect a "structure" on this land because the Osgoods had an interest in the land. As the trial court explained, the

> letter appears to relate to the issue of Norton's new dock and boat hoist, but it is not clear. It was around that time. It is not known what occurred in response to this letter other than to say nothing else happened of evidentiary value. The alleged dispute appeared to be resolved once again and the Osgoods acquiesced to the line until the property was sold to the Bischers on September 10, 2018.

The trial court went on to note that the Bischers did not have the disputed property surveyed or present testimony from any witnesses that had surveyed the property. "Instead[,] they hired an expert to review prior surveys rather than have him do his own. No calculations were performed or explanations provided to explain how the perpendicular line was established." Alternatively, Sycko testified that this case presented a unique circumstance with unknown variables that made the general rule unworkable and favored relying on the known fact, which was the vacated Althea Avenue arc.

The trial court ultimately found the Norton's evidence more persuasive than the Bischer's evidence and determined that the Norton's had a superior property interest in the contested pie shaped parcel. Although the trial court mentioned Joseph's testimony—regarding his alleged agreement with Milton Sr.—in its opinion and order, the trial court relied on ample evidence supporting the party's treatment of the boundary line when making its decision, including: (1) Peggy's testimony that the Norton's "won" the property dispute; (2) Milton Sr.'s lack of opposition to the Norton's 2002 proposal, which depicted the boundary line at the Althea Avenue arc; (3) the fact that Milton Sr. had asserted his property rights in the past but decided not to do so in this case; (4) the Bischer's failure to present a current survey or the testimony of a past surveyor; and (5) the fact that the parties kept the area open and unobstructed for decades.

We conclude that the trial court did not err by finding that the Nortons had a superior property interest in the contested pie-shaped parcel. This Court is especially deferential to the trial court's superior ability to judge the relative credibility of witnesses. *Fraser Twp*, ___ Mich App at ___; slip op at 2. There was ample evidence that the Osgoods and the Nortons treated the Althea Avenue arc as the boundary line in this case. Even assuming, arguendo, that the parties' acquiescence did not begin until the August 2003 letter, it supports the conclusion that the parties acquiesced for 15 years up and until the Bischer's bought the property in September 2018. Accordingly, the Althea Avenue arc became the boundary line. See *Killips*, 244 Mich App at 260. Because the disputed pie-shaped parcel of land was on the Norton's side of the Althea Avenue arc, the trial court did not err by finding that the Nortons had a superior property interest in it.

IV. TRESPASS

The appellants further argue that the trial court erred by finding that the Trelfas and the Bischers were liable for common law and intentional trespass. We disagree.

"A trespass involves the unauthorized invasion on the private property of another." *Mack v Natural Way, Inc*, ___ Mich App ___, ___; ___NW3d ___ (2025) (Docket No. 367998); slip op at 3 (quotation marks and citation omitted). "Recovery for trespass is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Wolfenbarger v Wright*, 336 Mich App 1, 15; 969 NW2d 518 (2021) (quotation marks and citation omitted). The intrusion must have been intentional, but the defendant's intent in causing a trespass is generally irrelevant. *Mack*, ___ Mich App at___; slip op at 3-4. Accordingly, a trespasser's intent simply must be "to be at the place on the land where the trespass allegedly occurred." *Id*. at ___; slip op 4 (quotation marks and citation omitted). "The distinction to be made is between accidental and intentional entries. Consequently, if the actor intends to be upon the particular piece of land, it is not necessary that he intend to invade the other's interest in the exclusive possession of his land." *Id*. (quotation marks, citations,

and alteration omitted). Therefore, it is immaterial whether the actor: (1) knew or should have known that he or she was not entitled to enter the land, (2) honestly and reasonably believed that he or she had the possessor's consent, and (3) had a mistaken belief of some other privilege to enter. *Id*.

Notably "[i]t is beyond dispute that a defendant's unauthorized act of causing excess waters to flow onto another person's property constitutes a trespass." *Wolfenbarger*, 336 Mich App at 15 (quotation marks and citation omitted). "This is because the unauthorized flooding of another person's land constitutes an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Id*. (quotation marks and citation omitted).

## A. UNAUTHORIZED INTRUSIONS

In this case, there were two phases of unauthorized intrusions onto the Norton's land. In the first phase, Kenneth: (1) shoveled out the swale and culvert, (2) drove heavy equipment onto the Norton's property, (3) removed fallen trees, (4) excavated the swale, (5) put in a 30-foot culvert extension with a flap gate to the river, (6) plugged the culvert inlet, (7) raised the elevation of the Norton's property surrounding the swale by about eight inches, and (8) pumped water from his lot and the Bischer's back lot into the swale. In the second phase, Badalamente: (1) staked out the property, (2) buried a 30-foot pipe where the swale used to be, and (2) installed a catch basin at the culvert inlet. At some point, the Bischers also raised a portion of their parcel about three to four feet, so it now grades down toward the Norton's property on the south side, creating an accumulation of surface water that must be pumped out. These intrusions have resulted in the loss of the swale and the accumulation of water on the Norton's property. These unauthorized invasions of the Norton's property clearly constitute trespasses. See *Mack*, ___ Mich App at___; slip op at 3-4; *Wolfenbarger*, 336 Mich App at 15.

## B. THE TRELFA'S DEFENSES

The Trelfas argue that: (1) Kenneth did not have the required intent to trespass because he merely wanted to address a waterflow issue for the betterment of the neighborhood; (2) the trial court erred by finding that their third-party claims against the McGeorges were frivolous; and (3) even if Kenneth did not have permission to enter the property, he is relieved from liability on the basis of an intervening cause: Badalamente's subsequent work. These arguments lack merit.

### 1. THE TRELFA'S INTENT

First, as previously stated, although trespass requires intentional intrusion, "the defendant's intent in causing a trespass is generally irrelevant." *Mack*, ___ Mich App at___; slip op at 3-4. Therefore, it is immaterial *why* Kenneth intruded on the land, simply that he did. The trial court properly found that Kenneth's many trespasses were knowing and intentional.

### 2. THIRD-PARTY AGENCY DEFENSE

Next, the Trelfas argue that the McGeorges had at least apparent authority over the Norton's property, and Kenneth reasonably believed, and acted in reliance on, the McGeorge's

representations of consent. Because this defense was devoid of legal merit, the trial court did not clearly err by finding it frivolous.

"Under fundamental agency law, a principal is bound by an agent's actions within the agent's actual or apparent authority." *DBD Kazoo LLC v Western Mich LLC*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 361299); slip op at 6 (quotation marks and citation omitted). "Actual authority of an agent may be implied from the circumstances surrounding the transaction at issue. These circumstances must show that the principal actually intended the agent to possess the authority to enter into the transaction on behalf of the principal." *Id*. (quotation marks and citations omitted). "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists." *Id*. (quotation marks and citation omitted). But, "apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Id*. (quotation marks and citations omitted). Whether the "agent possessed apparent authority to perform a specific act requires the court to review all surrounding facts and circumstances and determine whether an ordinarily prudent person in the relevant business would be justified in assuming that the agent had authority to act on behalf of the principal as alleged." *Id*.

In this case, Kenneth admitted that the Nortons did *nothing* to directly suggest that the McGeorges had any authority to grant him permission to enter the Norton's property. Because "apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent," any reliance that Kenneth placed in the McGeorge's statements alone cannot arise to apparent authority. *Id*. (quotation marks and citations omitted). Moreover, whether Kenneth honestly and reasonably believed that he had the Norton's consent to enter their land is immaterial for the purposes of trespass. See *Mack*, ___ Mich App at___; slip op at 4. The crux of the issue is that Kenneth admittedly intruded on the Norton's property and conducted extensive work on the swale and culvert without the Norton's consent. These actions clearly constituted trespasses. See *Mack*, ___ Mich App at___; slip op at 3-4; *Wolfenbarger*, 336 Mich App at 15.

In this case, the trial court found that the Trelfa's third-party agency defense concerning the McGeorges was frivolous. A defense is frivolous if "[t]he party's legal position was devoid of arguable legal merit." MCL 600.2591(3)(a)(*iii*). The McGeorges informed Kenneth that it was acceptable for his guests to park on the Norton's property, but the McGeorges never told Kenneth that they spoke to the Nortons and obtained their permission to tell Kenneth that he could work on the swale.[5] For the reasons previously stated, the Trelfa's third-party defense was devoid of legal merit; therefore, the trial court did not clearly err by finding it frivolous. See *Bradley*, 514 Mich at 705.

### 3. INTERVENING CAUSE: BADALAMENTE

---

[5] Notably, the Trelfas never tried to call the Nortons directly despite obtaining their phone number, never sent a letter to the Nortons, and did not physically go to the Norton's home in order to obtain their consent to change, clean, or reconstruct the swale.

The Trelfas further argue that even if Kenneth did not have permission to enter the Norton's property, he is relieved from liability on the basis of an intervening cause: Badalamente's subsequent work. Again, we disagree.

"An intervening cause breaks the chain of causation and constitutes a superseding cause which relieves the original actor of liability, unless it is found that the intervening act was reasonably foreseeable." *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985) (quotation marks and citation omitted). But, "[a]n intervening cause is not an absolute bar to liability if the intervening event is foreseeable, though negligent or even criminal." *Taylor v Wyeth Laboratories, Inc*, 139 Mich App 389, 402; 362 NW2d 293 (1984).

We conclude that Badalamente's actions were reasonably foreseeable in this case. After Kenneth's work, and before Badalamente's work, the Norton's property experienced flooding. Accordingly, it was reasonably foreseeable that the Nortons would seek assistance in fixing Kenneth's work. Although Kenneth did not directly work with Badalamente, Kenneth's and Badalamente's efforts were part of a cooperative effort to change the drainage in the area. Accordingly, Kenneth should not be relieved of liability when it was his actions that necessitated further drainage efforts in the same location. See *id*.

Therefore, the trial court did not err by finding the Trelfas liable for common law and intentional trespass.

## C. THE BISCHER'S DEFENSES

The Bischer's argue that: (1) there was no evidence that the pipe encroached upon the Norton's property, and (2) they should not be liable for Badalamente's trespasses because he was not acting as the Bischer's agent. These arguments lack merit.

### 1. PIPE PLACEMENT

The Bischer's first argument—that there was no evidence that the pipe encroached upon the Norton's property—lacks significance; even if it were true, it would not absolve the Bischers of liability because the trial court found the Bischer's liable for multiple instances of trespass, not just the pipe's placement. Nonetheless, the Nortons presented evidence that the pipe encroached upon the Norton's property. Sycko's survey showed that the pipe and catch basin were partially on the Nortons property. One of the defense's experts testified that according to his investigation and resulting diagram, the pipe was solely on the Bischer's property; however, he acknowledged that according to Sycko's survey, the pipe and the catch basin were both partially on the Norton's property. As previously stated, the trial court did not err by adhering to the property lines in Sycko's survey. Therefore, because the pipe and catch basin were both partially on the Norton's property according to Sycko's survey, the trial court did not clearly err by finding that the pipe encroached upon the Norton's property. See *Midwest Valve & Fitting Co*, 347 Mich App at 250.

### 2. AGENCY

The trial court also did not err by rejecting the Bischer's "Badalamente defense." Even though the pipe was Badalamente's idea, and the Bischer's did not pay for its installation, the

Bischer's explicitly consented to Badalamente's actions. Considering that Badalamente was the contractor currently building the Bischer's house, and that the pipe was partially installed on the Bischer's property, the trial court did not err by finding that the Bischer's consent to Badalamente's actions gave Badalamente actual authority to act as their agent in that regard. See *DBD Kazoo LLC*, ___ Mich App at ___; slip op at 6.

Therefore, the trial court did not err by finding the Bischers liable for common law and intentional trespass.

## V. STATUTORY CONVERSION

The Trelfas further argue that the trial court erred by finding them liable for statutory conversion under MCL 600.2919(1)(a). We disagree.

"Conversion, both at common law and under the statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Branch v Rudolph*, ___ Mich App ___, ___; ___NW3d ___ (2025) (Docket No. 368071); slip op at 6 (quotation marks and citation omitted). "[I]n addition to the common-law elements for conversion, a plaintiff claiming statutory conversion must show that the conversion was for the defendant's own use." *Id.* (quotation marks and citation omitted). "Someone alleging conversion to the defendant's own use under MCL 600.2919a(1)(a) must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Branch*, ___ Mich App at ___; slip op at 6-7 (quotation marks, citation, and alteration omitted). "Good faith, mistake, and ignorance are not defenses to a claim of conversion." *Branch*, ___ Mich App at ___; slip op at 7 (quotation marks and citation omitted).

On appeal, the Trelfas first argue that none of the Norton's soil was removed from their property. This argument is directly contradicted by the record. Kenneth testified that he never moved the Norton's dirt off the Norton's property; however, he also admitted to commingling the Bischer's and the Norton's dirt from the excavated swale and using it to: (1) restore the grade on the Norton's property; (2) complete the culvert-extension project; and (3) with Gregory's permission, *fill his own vacant parcel*. Accordingly, the facts of record provide no support for this argument.

The Trelfas further argue that there was no evidence that Kenneth converted the soil for his own use because "[a]lthough Trelfa benefitted from his property also not flooding, all of his work, including moving the dirt, was to prevent flooding in the neighborhood and fix the swale . . . ." But as previously stated, good faith is not a defense to statutory conversion. See *id*. Because Kenneth admitted to moving a portion of the comingled soil to fill his own vacant parcel, he clearly used the soil "for some purpose personal to [his] interests," and therefore, his own use. See *Branch*, ___ Mich App at ___; slip op at 6-7 (quotation marks and citation omitted). Accordingly, the trial court did not err by finding that the Trelfas committed statutory conversion.

## VI. PERMANENT INJUNCTION

The appellants further argue that the trial court abused its discretion by issuing a permanent injunction against the Trelfas and the Bischers. Here again, we disagree.

"In addition to money damages, a plaintiff may be entitled to injunctive relief to enjoin a continuing trespass." *Wiggins v City of Burton*, 291 Mich App 532, 558; 805 NW2d 517 (2011). "It is true that injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury, and that granting injunctive relief is within the sound discretion of the trial court." *Id*. at 558-559 (quotation marks, citation, and alterations omitted). "The general rule is that the court will balance the benefit of an injunction to plaintiff against the inconvenience and damage to defendant, and grant an injunction or award damages as seems most consistent with justice and equity under all the circumstances of the case." *Id*. at 559 (quotation marks and citation omitted). "But a court is not bound to engage in a balancing of the relative hardships and equities if the encroachment resulted from an intentional or wilful act . . . ." *Id*. (quotation marks and citation omitted). "This Court has held that when a trespass is of a permanent or continuous character, injunction is an appropriate remedy." *Id*. (quotation marks and citation omitted). "[F]or example, when certain defendants committed a trespass and exceeded the scope of their easement by impermissibly installing a sewer line across the servient estate, this Court affirmed the circuit court's permanent injunction prohibiting the defendants' use of the sewer line and requiring them to remove it." *Wiggins*, 291 Mich App at 559; citing *Soergel v Preston*, 141 Mich App 585, 589-590; 367 NW2d 366 (1985).

In this case, the trial court determined that the appropriate remedy was a detailed, permanent injunction against the Trelfas and Bischers, which essentially entailed returning the swale to "the status quo as it existed before [Kenneth] committed his first act of trespass."

## A. *KERNEN* FACTORS

The Bischers argue that the trial court erred by not accounting for the all the factors set forth in *Kernen v Homestead Dev Co*, 232 Mich App 503, 514-515; 591 NW2d 369 (1998), when issuing the injunction. We disagree.

In *Kernen*, 232 Mich App at 514, this Court listed the following factors for a trial court to consider when issuing an injunction:

(a) the nature of the interest to be protected,

(b) the relative adequacy to the plaintiff of injunction and of other remedies,

(c) any unreasonable delay by the plaintiff in bringing suit,

(d) any related misconduct on the part of the plaintiff,

(e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicability of framing and enforcing the order or judgment.

The Bischers specifically argue that the trial court should have considered the Norton's conduct under factor (c), including their: (1) instruction to Badalamente to fill in the swale, (2) subsequent claim that Badalamente was working as the Bischer's agent when doing so, and (3) failure to provide their experts with surveys that did not go their way. But as previously stated: (1) Badalamente understood that the Nortons wanted the swale restored to its original condition; (2) the trial court did not err by finding that Badalamente was acting as the Bischer's agent; and (3) after Sycko performed his survey, he reviewed the conflicting surveys. Although the trial court did not address these considerations in direct correlation with the *Kernen* factors, it referenced these considerations throughout its lengthy opinion and order following trial.

Additionally, this Court has held that "a court is *not bound* to engage in a balancing of the relative hardships and equities if the encroachment resulted from an intentional or willful act." *Kernen*, 232 Mich App at 513 (quotation marks and citation omitted); see *Wiggins*, 291 Mich App at 559. Accordingly, because the Trelfa's and the Bischer's acts of trespass were intentional and willful, the trial court did not need to analyze each of the *Kernen* factors before issuing the injunction. See *Wiggins*, 291 Mich App at 559; *Kernen*, 232 Mich App at 513. And because the Trelfa's and the Bischer's trespasses were of a permanent and continuous character, the trial court did not abuse its discretion by issuing a permanent injunction in this case. See *Wiggins*, 291 Mich App at 559 (quotation marks and citation omitted).

## B. FEASIBILITY, PROPORTIONALITY, AND BENEFIT

The Trelfas argue that the permanent injunction is infeasible, disproportionate, and would likely not remedy existing and future drainage issues in the neighborhood. The evidence presented at trial directly contradicts this argument.

Regarding the injunction's feasibility, one of the defense's experts testified that it would be possible to remove the pipe and restore the swale to its original condition. Moreover, when asked what he thought it would entail to return the swale to its original condition, Kenneth stated the following:

> [A] 12 hour day for, uh, two pieces of equipment, one, one being a loader and one being a dozer, and, and then a laborer also to handle the pipe and do any hand work, shoveling and etc., and basically push the pipe out of there, grade the soils back down to, uh, what would be the original swale, uh, location. And we would just look at some pictures and then, uh, I would propose that the rest of the dirt would just be gifted to the Nortons and spread out in any low areas that they had a concern with just to help the cause.

The Nortons now argue that Kenneth's statement was made within the context of the work he performed, but not in consideration of the additional work Badalamente performed. This argument is not convincing considering that *directly after Kenneth's statement*, the following exchange occurred:

> [*The Trelfa's Counsel*]: Because Badalamente brought in dirt.

-14-

[*Kenneth*]:  Well, there is excess dirt there, yes.  Right now.

Regarding the injunction's proportionality and benefit, as previously stated, "a court is *not bound* to engage in a balancing of the relative hardships and equities if the encroachment resulted from an intentional or willful act."  *Kernen*, 232 Mich App at 513 (quotation marks and citation omitted); see *Wiggins*, 291 Mich App at 559.  Therefore, because the Trelfa's and the Bischer's acts of trespass were intentional and willful, the trial court did not need to balance the relative hardships and equities in this case.  See *Wiggins*, 291 Mich App at 559; *Kernen*, 232 Mich App at 513.  Nonetheless, the evidence established that the original swale historically provided proper drainage for the Norton's and the Bischer's properties.  In fact, because the swale provided adequate drainage, the initial intent when building the Bischer's new home was to leave the swale as is.  The Trelfa's drainage concerns regarding neighboring properties, including their own, is misplaced.  The Trelfa's property had drainage issues before the swale was altered; therefore, returning the swale to its original condition would not present any new, additional hardship; it would simply shift the hardship back to its original state.

## C. EQUITY

The Trelfas further argue that equity would not be served by making the Trelfas pay for Badalamente's actions.  But as previously stated, Kenneth's and Badalamente's efforts were part of a cooperative effort to change the drainage in the area.  Accordingly, the Trelfas should not be relieved of liability when it was Kenneth's actions that necessitated further drainage efforts in the same location.  See *Taylor*, 139 Mich App at 402.

## VII. ATTORNEY FEES

We also conclude that the trial court did not abuse its discretion by awarding attorney fees in this case.[6]

## A. THE TRELFA'S ARGUMENT

The Trelfas argue that attorney fees were improper because the trial court erred in its rulings regarding the underlying claims.[7]  But because we conclude that the trial court did not err,, this argument is unpersuasive.

---

[6] Neither appellant contests the amount of fees awarded, simply *that* fees were awarded.

[7] In their reply brief, the Trelfas raise an additional argument: that the trial court reversibly erred in awarding attorney fees as exemplary damages for intentional trespass.  Although the Bischers raised this issue was raised in Docket No. 369453, it was not raised in Docket No. 369409 until the Trelfa's reply brief.  "Reply briefs must be limited to rebuttal of the arguments in the appellee's or cross-appellee's brief . . . ."  *Bronson Methodist Hosp v Mich Assigned Claims Facility*, 298 Mich App 192, 199; 826 NW2d 197 (2012) (quotation marks and citation omitted).  "Raising an issue for the first time in a reply brief is not sufficient to present the issue for appeal."  *Id*. (quotation

## B. THE BISCHER'S ARGUMENT

The Bischers argue that the trial court erred by awarding attorney fees as exemplary damages for intentional trespass. We disagree.

The trial court awarded the Nortons "$29,787.30 for attorney fees against the Bischers as exemplary damages for Intentional Trespass under MCL 600.2919(1)(b)[.]"

"Exemplary damages are a class of compensatory damages that allow for compensation for injury to feelings." *McPeak v McPeak*, 233 Mich App 483, 487; 593 NW2d 180 (1999). "In order to justify an award of exemplary damages, the act or conduct complained of must be voluntary and the act must inspire feelings of humiliation, outrage, and indignity." *Id*. "The act or conduct must also be malicious or so wilful and wanton as to demonstrate a reckless disregard of plaintiff's rights." *Id*. at 487-488.

"Michigan adheres to the general rule that attorney fees are not recoverable, either as an element of costs or as an item of damages, unless expressly authorized by statute, court rule, or a recognized exception." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 286; 761 NW2d 761 (2008) (quotation marks and citation omitted). But "recovery has been allowed in limited situations where a party has incurred legal expenses as a result of another party's fraudulent or unlawful conduct." *Id*. (quotation marks, citation, and alteration omitted). For example, *Larson v Van Horn*, 110 Mich App 369, 384; 313 NW2d 288 (1981), this Court explained as follows:

> We are not aware of any Michigan case law which would prevent this Court from ruling that attorney fees may be awarded as exemplary damages in cases such as this where the court finds that a party guilty of wrongdoing acted intentionally, requiring a less culpable defendant to defend itself in a suit arising from the same action and necessitating the plaintiff's bringing of such a suit.

Moreover, in *Ypsilanti*, 281 Mich App at 286, the plaintiff was forced to incur substantial costs and attorney fees—in that case, not in "a suit arising from the same action" like in *Larson*—in prosecuting the defendant's illegal and egregious discharge of raw sewage into a public storm drain. See *Larson*, 110 Mich App at 384. This Court held that the circuit court's award of attorney fees for the plaintiff was within the range of reasonable and principled outcomes. *Id*. at 287.

In this case, the trial court found that the Bischer's "trespass was not accidental or incidental. It was knowing, intentional and purposeful in achieving a desired outcome." The Nortons were very clear that they did not want the swale altered in any way, yet Kenneth and Badalamente, as the Bischer's agent, intruded on the Norton's property time and again. Because the Norton's and the Bischer's trespasses were "so wilful and wanton as to demonstrate a reckless disregard of [the Norton's] rights," the trial court's award of attorney fees for plaintiff was within the range of reasonable and principled outcomes. See *id*.

---

marks, citation, and alteration omitted). Therefore, we decline to address this issue with regard to the Trelfas. See *id*.

Affirmed.

/s/ James Robert Redford
/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi